[Cite as *In re K.T.*, 2018-Ohio-4312.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: K.T.1, A.T., K.T.2 and K.T.3 | : | APPEAL NOS. C-180335 |
| | | C-180376 |
| | : | C-180390 |
| | | TRIAL NO. F12-1273Z |
| | : | |
| | : | *O P I N I O N.* |

Appeals From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Judgment Entered

Date of Judgment Entry on Appeal: October 24, 2018

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Donald D. Clancy, III*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Jessica Moss*, Assistant Public Defender, Appellant Guardian ad Litem for K.T.1, A.T., K.T.2 and K.T.3,

*Christopher P. Kapsal*, for W.A., Appellant Father of K.T.1, A.T., and K.T.2,

*Roger Kirk*, for Appellant Mother.

**CUNNINGHAM**, **Presiding Judge.**

{¶1}    These consolidated appeals arise from the custody determinations of four minor children, K.T.1, A.T., K.T.2, and K.T.3, who share the same mother ("Mother"), and were the subjects of requests for permanent custody to the Hamilton County Department of Job and Family Services ("HCJFS" or "the agency"). The juvenile court remanded legal custody of K.T.1 and A.T., the two oldest children, to the custody of Mother, and granted permanent custody of K.T.2 and K.T.3, the two youngest children, to HCJFS. As part of its analysis, the juvenile court determined that K.T.3 "could not and should not" be placed with Mother "within a reasonable time." The court's determination that placement with Mother was not possible is supported by clear and convincing evidence and applies equally to the other children. Because of this, and for the other reasons that follow, we affirm the juvenile court's judgment to the extent that it granted permanent custody of K.T.2 and K.T.3 to HCJFS, but reverse the judgment to the extent that it failed to grant permanent custody of K.T.1 and A.T. to HCJFS.

## Procedural Posture

{¶2}    This case began over six years ago and is before this court for a second time upon a review of the permanent-custody determinations with respect to these children. In a judgment entered on November 20, 2017, the juvenile court remanded legal custody of the two oldest children to Mother and granted permanent custody of the two youngest children to HCJFS, after setting aside a magistrate's decision awarding legal custody of the three oldest children to W.A., their father, and the youngest child to Mother. Mother, W.A., HCJFS, and the guardian ad litem for the children ("GAL") appealed. Upon review, this court was unable to determine from the juvenile court's judgment entry whether it had considered all the statutory factors when determining what disposition was

2

in the best interest of the children. We reversed the juvenile court's judgment on that basis and remanded the cause for further proceedings. We instructed the court on remand to "consider[]" all "the best-interest factors," and "to state with specificity its ruling on each of the pending motions for permanent custody of K.T.1, A.T., and K.T.2, and on the complaint requesting an initial disposition of permanent custody for K.T.3, as affecting each parent." *In re K.T.1*, 1st Dist. Hamilton Nos. C-170667, C-170687, C-170701 and C-170702, 2018-Ohio-1381, ¶ 16 ("*In re K.T.1 I*"). We determined that the other assignments of error were rendered moot by our disposition, except for an assignment of error that we overruled alleging that the juvenile court had erred by failing to specifically rule on objections to the magistrate's decision. *Id.* at ¶ 11 and 16.

{¶3} At the remand hearing on May 14, 2018, the juvenile court accepted updated Family Nurturing Center ("FNC") records relating to Mother's and W.A.'s visitation with their children during the pendency of the proceedings. On June 11, 2018, the juvenile court entered its judgment specifying that it was disposing of the pending March 10, 2015 and June 22, 2016 motions to modify HCJFS's temporary custody of K.T.1, A.T., and K.T.2 to permanent custody, as well as entering an initial disposition for K.T.3. The juvenile court again remanded legal custody of K.T.1 and A.T. to Mother, after determining that was in their best interest, but granted permanent custody of K.T.2 and K.T.3 to HCJFS. With respect to both of these children, the court determined that termination was in their best interest, and with respect to K.T.3, the court determined that Mother was unsuitable.

{¶4} In these appeals, taken from the juvenile court's June 2018 judgment, Mother challenges the court's grant of permanent custody of K.T.2 and K.T.3 to HCJFS. W.A., the father of K.T.1, A.T., and K.T.2, challenges the juvenile court's termination of his

3

parental rights with respect to K.T.2, and the juvenile court's rejection of the magistrate's decision that had granted him legal custody of K.T.1 and A.T. The children's guardian ad litem ("GAL") appeals on behalf of K.T.1 and A.T., challenging the juvenile court's denial of the motions for permanent custody of K.T.1 and A.T. The alleged father of K.T.3, L.D., has not appeared in the action, and HCJFS has appeared only as an appellee.

### Background Facts

{¶5} HCJFS became involved with the family in 2012 due to Mother's mental instability, substance abuse, and potential to harm the children. Mother, who has been diagnosed with paranoid-type schizophrenia, post-traumatic stress disorder, and a mild developmental disability, was hospitalized in May 2012, following a "psychotic breakdown." Mother had been hospitalized four previous times when she had not been taking her medication, Risperdal.

{¶6} On June 7, 2012, HCJFS filed a complaint seeking temporary custody of K.T.1 and A.T., who had been living with Mother. The agency could not locate their father, alleged in the complaint to be "Antonio W.A."

{¶7} HCJFS obtained interim custody of those children, who were almost 21-months and nine-months-old respectively. At that time, the agency also obtained interim custody of Mother's fifteen-year-old daughter from another relationship, T.B., who was eventually remanded to the legal custody of Mother under protective supervision after having been in the temporary custody of the agency.

{¶8} The juvenile court adjudicated K.T.1 and A.T. dependent on July 27, 2012, and granted temporary custody to HCJFS, with the continuation of reunification services. These reunification services focused on Mother's

management of her mental illness, including medication management, therapy and case management.

{¶9} K.T.1 and A.T. were first placed with a maternal aunt upon removal from Mother, but were removed from that home a short time later after Mother and the aunt violated a safety plan. Evidence at the permanent-custody hearing demonstrated that these two children were then placed together in the same foster home where they have remained.

{¶10} Early in the case, Mother was not compliant with her mental-health and substance-abuse treatment at Crossroads, and was transferred to the Central Community Health Board ("CCHB"). At CCHB, Mother was assigned to Christina Glynn, a mental-health specialist who remained Mother's case manager during the case.

{¶11} K.T.2 was born in January 2013, and was placed in the interim custody of HCJFS upon her discharge from the hospital. At the time of K.T.2's birth, Mother was staying in a homeless shelter, not taking her medications, and was exhibiting signs of her mental illness. Although Mother had been attending weekly supervised visitation with her children, her parenting was not appropriate. The juvenile court adjudicated K.T.2 dependent on April 1, 2013, and awarded temporary custody to HCJFS, with the continuation of reunification services. K.T.2 was placed with a foster family, where she remains.

{¶12} In October 2013, HCJFS moved to modify temporary custody of K.T.1, A.T., and K.T.2 to permanent custody. In April 2014, however, at the agency's urging, the request for permanent custody was held in abeyance due to Mother's progress.

{¶13} But Mother regressed and continued to experience psychotic symptoms, including delusions and auditory hallucinations, and was intermittently homeless. Thus, in March 2015, the GAL moved to change temporary custody of K.T.1, A.T., and K.T.2 to permanent custody, on the allegation that each child had been in the temporary custody of HCJFS for 12 or more months of a consecutive 22-month period, and that it was in each child's best interest for the court to grant permanent custody to the agency. The GAL also contended that the children could not be returned to either parent within a reasonable time or should not be returned to either parent, citing, among other things, Mother's failure to obtain mental-health and housing stability, and the alleged father's (listed as Antonio W.A.) lack of commitment to the children for failing to regularly support, visit, or communicate with the children. The children, the GAL reported, were too young to express their wishes.

{¶14} Mother gave birth to K.T.3 in May 2015, and HCJFS filed a complaint alleging that W.A. was the father and requesting a disposition of permanent custody. On May 3, 2015, the juvenile court placed K.T.3 in the interim custody of HCJFS upon his discharge from the hospital.

{¶15} Around June 2015, W.A. appeared and the court appointed him an attorney. The court also ordered an independent psychological assessment of Mother at the request of her guardian ad litem. The assessor confirmed at the November 2015 assessment that Mother met the criteria for "Unspecified Schizophrenia Spectrum and Other Psychotic Disorder" and "Borderline Intellectual Functioning," and determined that Mother had a deficiency in basic parenting problem-solving skills. For Mother to parent effectively, the assessor recommended

Mother's continued attendance at individual or group therapy, continued adherence to prescribed medications, and continued regular appointments with her prescriber to assess her symptoms.

{¶16}   In a report filed in October 2015, the children's GAL recommended permanent custody for K.T.3.  At the same time, she updated her recommendation with respect to K.T.1, A.T., and K.T.2, maintaining that permanent custody to HCJFS was in their best interest.  That same month, the agency amended its complaint with respect to K.T.3 to allege that L.D. was his father, after DNA testing ruled out W.A. as the father of the child.

{¶17}   The juvenile court adjudicated K.T.3 dependent on April 20, 2016.  At that time, the court found, based on the evidence presented, that Mother had not successfully or satisfactorily engaged in necessary mental-health services, was inconsistent in taking her medications, had only marginally progressed in her visitation, and had not received sufficient prenatal care during her pregnancy.  The court continued the proceedings for disposition.

{¶18}   In May 2016, HCJFS withdrew its October 2013 request for permanent custody with respect to K.T.1 and A.T. when it filed a motion to terminate temporary custody and award legal custody of those two children to W.A., who had been confirmed as their father, and K.T.2's father, by DNA testing.  The agency withdrew that motion, however, upon learning that W.A. was the subject of a substantiated sexual-abuse allegation involving J.A., his daughter from another relationship.  In June 2016, HCJFS again moved for permanent custody of K.T.1 and A.T. on the same grounds as set forth in the October 2013 motion.

{¶19}   The permanent-custody hearing for K.T.1, A.T., and K.T.2 started in May 2015, and was later combined with the dispositional hearing for K.T.3.   The combined hearing was still in progress on January 5, 2017, when the magistrate ordered that the testimony be set aside and the hearing be restarted due to developments in the case.   The combined restarted hearing occurred over four days beginning in March 2017 and ending in May 2017.

{¶20}   During this combined hearing, various witnesses testified on behalf of the parties, including Kendra Collins, the HCJFS caseworker assigned to the children in the fall of 2015 until she left the agency in February 2017, who recommended a grant of permanent custody to the agency.  According to Collins, Mother had been diagnosed with paranoid-type schizophrenia, post-traumatic stress disorder, and a mild cognitive delay.  Mother's psychological evaluation indicated that she required a strong support system to succeed in competently parenting the children, and her case plan involved consistent individual mental-health therapy, medication management with her psychiatrist, and visitation with the children.   Collins explained that Mother had progressed to the point of acknowledging her paranoid-type schizophrenia and taking her medications, but that she had a history of "going back and forth" with respect to understanding her mental-health issues.  Mother also still presented with "significant paranoia" and at times her mental-health issues "affected her ability to function."

{¶21}   Collins noted that Mother's "belligerence" while with her oldest daughter at a local casino in January 2016 had led to her arrest for disorderly conduct and criminal trespass, charges that were still pending at the time of the permanent-custody hearing.   Further, Mother was inconsistent in attending

appointments with her treating psychiatrist and had not completed her recommended mental-health therapy.

{¶22} With respect to Mother's income, Collins relayed that Mother receives some income from Social Security and was employed at times, but often changed jobs. With respect to housing, Collins stated that Mother had appropriate housing at the time of the hearing, but had been homeless several times over the years. Collins noted that Mother was not at fault for her most recent period of homelessness, occurring in 2016 when the house she rented was foreclosed upon, but expressed concern that it had taken Mother six months to regain appropriate housing.

{¶23} Collins acknowledged that Mother had bonded with her children during her weekly four-hour visitations that were supervised by someone from the FNC. But since visitation began in 2012, Collins explained, Mother had not been able to progress to any unsupervised visitation with the children.

{¶24} Collins testified that she first met W.A. in September or October of 2015, by chance, when he was present during a visit at Mother's house. Collins told W.A. that the children were in the agency's custody, and he did not ask to visit them.

{¶25} W.A. did not start visiting with the children until around February 2016, about a month after DNA testing confirmed his parentage of those children. DNA testing did not occur earlier because W.A. "was not present during the case." W.A. submitted to a requested diagnostic assessment that revealed no diagnoses or treatment recommendations. The agency then promoted that he obtain custody, and his visits progressed to unsupervised visitation with K.T.1 and A.T. W.A.'s visitation with K.T.2 remained supervised, as she had reacted poorly to the interaction and was regressing.

{¶26}   In June 2016, HCJFS stopped W.A.'s visitation with K.T.1, A.T., and K.T.2, after substantiating an allegation that W.A. had sexually abused J.A., his daughter from a different mother.   J.A.'s two brothers were placed in the legal custody of W.A. after HCJFS concluded its investigation of the allegation, but J.A. was not.   Collins could not recommend that K.T.1, A.T., or K.T.2 be placed with him because of the allegation and vulnerable ages of those children.   W.A.'s visitation with K.T.1, A.T., and K.T.2 resumed in February 2017 by court order at W.A.'s request.

{¶27}   Collins' testimony with respect to the foster families indicated that the children were comfortable with their foster homes and were excelling.   The foster mother of K.T.2 and K.T.3 provided testimony further establishing that those two children were happy and healthy, and had bonded with their foster family.   This foster mother also indicated her willingness to adopt K.T.2 and possibly K.T.3, both of whom called her "Mommy."

{¶28}   Psychiatrist Dr. Cyma Khalily testified that she had begun treating Mother in August 2013, about a year after Mother's involuntary hospitalization.   Dr. Khalily explained that Mother had been diagnosed as having schizophrenia with a mood and thought disorder involving some paranoia and psychosis.   She emphasized the importance of Mother's understanding that she needed mental-health treatment, and her continuation with the prescribed dosage of Risperidone, the generic for Risperdal, for Mother to stabilize her mental health.   Dr. Khalily believed that Mother had finally become consistent in taking her prescribed dosage of Risperidone, but that Mother often exhibited only "fair" or "poor" insight into her condition.   And Dr. Khalily noted that mother exhibited "fair" or "poor" judgment

with respect to her daily decision making. For instance, Mother did not obtain prenatal care during her pregnancy with K.T.3. Finally, Dr. Khalily reported that Mother was not compliant with the requirement that she attend appointments every 90 days, and had not met with Dr. Khalily between July 2016 and December 2016.

{¶29} Dr. Khalily concluded that Mother's improvement over the three-and-one-half years of treatment was not steady, but instead had fluctuated and continued to be marked with "ups and downs."

{¶30} Christina Glenn, Mother's mental-health specialist at the Central Community Health Board since 2013, testified to her concerns with Mother's mental-health stability. Glenn had observed since late 2015 a general improvement in Mother's compliance with taking her medication and understanding of the necessity of taking her medications and attending therapy. But Glenn recalled that, in March 2016, Mother reported that she was not mentally ill and did not need to take medication, and in May 2016, Mother denied a need for treatment. Further, Glenn had to "redirect" Mother's hostility towards HCJFS for removing her children "pretty much every time" they met. And, although there was a recommendation that Mother meet with Glenn at a minimum of once a month, Mother had only met with Glenn once between August 2016 and February 2017.

{¶31} Mother and her adult daughter T.B. also testified. Mother indicated that she had become compliant with taking the a dosage of 2 mg of Risperidone, unless pregnant, to "take[] away the noise" caused by her paranoid schizophrenia. She conceded that she had not completed her recommended mental-health therapy with Glenn, claiming that the failure was due to her confusion caused by a change or a proposed change in service providers. When asked if she would continue mental-

11

health therapy in the future, she indicated that it was not necessary because she could "cope out there" without it and would continue therapy only if her case manager recommended she do so. At the same time, she agreed that the mental-health therapy helped her to manage and reduce the symptoms of her mental illness.

{¶32} Mother relayed that she had a strong bond with her children, who called her "Mommy," and that she could care and provide for them. Although she had appropriate housing, her income was limited to Social Security payments of $800 a month, and she was unemployed at the time of the hearing after voluntarily terminating her employment at a local hotel. She expressed an interest in obtaining her GED and a job in the future. Mother also acknowledged that she had had periods of homelessness and difficulty paying her bills over the years, and that she had failed to appear in court on the disorderly-conduct and criminal-trespass charges that remained pending against her, resulting in the issuance of bench warrants.

{¶33} T.B., who was 20 years old at the time of the permanent-custody trial, testified that Mother had appropriately parented her, K.T.1, A.T., and an older sibling. T.B. further claimed that at the many visitations with Mother and half-siblings that she had attended, Mother had acted appropriately with K.T.1, A.T., K.T.2 and K.T.3, and T.B. had observed bonding within the entire family and the children treating Mother as their "mom." T.B. indicated that she would be present to help Mother with the children, but she also expressed an interest in furthering her training and getting a job, and admitted that she had moved back into Mother's home only a few months before the permanent-custody hearing.

{¶34} Anthony Jackson testified that he was the HCJFS caseworker involved in another case with three of W.A.'s other children, including J.A. Jackson

confirmed that J.A.'s brothers were living with W.A. in a three-bedroom home that W.A. shared with two other adults, including W.A.'s mother. According to Jackson, he had recommended that W.A. be remanded legal custody of J.A.'s two brothers, because W.A., who was never charged criminally based on J.A.'s allegation, had performed well on a Sexual Offender Diagnostic Assessment ("SODA") administered in November 2016 and a Family Access Integrated Recovery Assessment ("FAIR") in March 2016. Further, Jackson found W.A.'s parenting with respect to those two sons appropriate and the sons' ages and maturity allowed them to self-protect. But Jackson conceded that there was not a reunification plan for W.A. and his daughter J.A.

{¶35} The SODA report, accepted into evidence, contains W.A.'s statement that he did not know about the pending case involving K.T.1, A.T., and K.T.2 for several years because correspondence from the agency sent to his home had been addressed to a person identified by the first name "Antonio." The latter part of this statement is consistent with notations in the court's docket reflecting agency correspondence addressed to "Antonio A." and delivered to the address where W.A. stated he had lived since 2008. But the FAIR report was also accepted into evidence, and contains W.A.'s statement that he knew about the agency's involvement with K.T.1, A.T., and K.T.2, yet decided to "focus on the three children that he had," claiming that Mother had told HCJFS that he was not their father and he "did not know what to do."

{¶36} Nikki Richardson, the FNC visitation facilitator for W.A.'s supervised visitation with the children that started in late February 2017, testified that W.A. had attended every weekly visitation through May 24, 2017. She had observed bonding at

the visitations, and indicated that she would recommend the switch to a supervised-but-less-restrictive visitation with all three children if the visits continued to be appropriate.

{¶37} W.A.'s mother and sister also testified, advocating that W.A. be granted custody of K.T.1, A.T., and K.T.2 due to his parenting skills and the bonding they had observed. They both recalled that W.A. had indicated that he believed he was the father of K.T.1 and A.T. when they were born. His mother stated that she was introduced as their grandmother. His sister recalled that W.A. was still in a relationship with Mother when K.T.2 was born, and she had learned of K.T.2's birth from W.A.

{¶38} W.A.'s mother and sister were both unaware, however, that W.A. had not supported or visited his children for years after the agency had obtained custody of them. And his mother indicated that she did not know about the agency's involvement until 2016 because, until that time, all the paperwork from the agency had come to their house addressed to "Antonio A.," not "W.A."

{¶39} At the remand hearing in May 2018, additional FNC records were admitted into evidence. Those records demonstrated that W.A. had stopped visitation with his children in November 2017 and, as a result, FNC had terminated his visitation. Further, the records showed that Mother's visitation had been changed to the more restrictive facilitated level in October 2017, with the recommendation to continue at this level due to Mother's emotional outbursts and her difficulty in redirecting K.T.1 and A.T.

{¶40} Also at the remand hearing, the GAL updated the court with an oral report of the children's wishes. To that end, she said that K.T.1, A.T., K.T.2 had not

expressed any consistent desire to live with either parent, and that K.T.3 was still too young to express his wishes.

{¶41} In this appeal, Mother presents one assignment of error, raising several issues and seeking a reversal of the juvenile court's judgment terminating her parental rights to K.T.2 and K.T.3. W.A. presents three assignments of error, and seeks a reversal of the juvenile court's judgment terminating his parental rights to K.T.2, with an award of custody of that child to him or Mother. Alternatively, he urges that custody of K.T.1, A.T. and K.T.2 be awarded to him, as recommended by the magistrate in a decision that the juvenile court set aside. The GAL raises three assignments of error, seeking to reverse the juvenile court's judgment to the extent that it denied the motions for permanent custody and awarded legal custody of K.T.1 and A.T. to Mother.

## Analysis

{¶42} We begin our analysis by reviewing W.A.'s first assignment of error, contending that the juvenile court's June 2018 judgment did not comply with this court's remand order, in violation of the law-of-the-case doctrine.

{¶43} The law-of-the-case doctrine functions to compel trial courts to follow the mandate of a reviewing court. *Nolan v. Nolan*, 11 Ohio St.3d 1, 3, 462 N.E.2d 410 (1984). Generally, a trial court errs when its entry on remand does not fulfill the requirements of that mandate. *See id.* at 3-4. W.A. argues that the juvenile court did not comply with our specific mandate that it "consid[er]" all the best interest factors because the court did not "discuss" in its entry all the best interest factors as applied to each parent.

{¶44}   In support for his argument, W.A. cites a case from the Eleventh District Court of Appeals, *In re Kelley*, 11th Dist. Ashtabula No. 2002-A-0088, 2003-Ohio-194.  The court in that case, following its own precedent, held that the juvenile court's failure to discuss each of the factors set forth in R.C. 2151.414(D) when reaching a determination concerning the best interest of the child was prejudicial error.  *Id.* at ¶ 25.

{¶45}   This court, however, has never held that the juvenile court must "discuss" each of the best-interest factors to meet the mandate that it "consider" all the elements of R.C. 2151.414(D) when making the best-interest determination.   *In re K.T.1 I*, 1st Dist. Hamilton Nos. C-170667, C-170687, C-170701 and C-170702, 2018-Ohio-1381, at ¶ 14.   During the initial appeal of this case, this court reversed for the reason that the juvenile court had omitted a reference to the mandatory R.C. 2151.414(D)(1)(e) factors in its opinion, and had not otherwise provided any indication in its opinion that those factors had been considered.  *Id.*

{¶46}   We strongly encourage the juvenile court's discussion of each factor, but we cannot find error in the juvenile court's failure to discuss each factor if the record otherwise indicates that all of the necessary factors were considered.  *See id.*

{¶47}   Here, the juvenile court in its June 2018 judgment specified that it had considered all of the statutory best-interest factors when disposing of the pending motions affecting the parental rights of Mother and W.A.  And, as discussed more fully below, it also stated findings that were relevant to its analysis.  Thus, while the juvenile court did not discuss each best-interest factor, it was not required to do so in light of this record.

{¶48} Because we are satisfied that the juvenile court complied with our mandate to consider all of the best-interest factors on remand, we overrule W.A.'s first assignment of error. Further, to the extent that Mother's sole assignment of error raises this issue, we overrule it for the same reason.

{¶49} Next we address the assignments of error from Mother, W.A., and the GAL challenging the sufficiency and weight of the juvenile court's permanent-custody determinations. Before a natural parent's constitutionally protected liberty interest in the care and custody of that parent's child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for terminating parental rights have been met. *See* R.C. 2151.414; *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809; *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829.

{¶50} This court will not substitute its judgment for that of the juvenile court where some competent, credible evidence supports its determination. *See In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 46. Like in other civil cases, there is a difference between our review for the sufficiency of the evidence and a review for the weight of the evidence. *In re A.B.*, 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 14. Our sufficiency review asks whether enough evidence exists to justify the juvenile court's relevant findings under a clear-and-convincing standard. Our review for weight involves a determination of the persuasiveness of that evidence in comparison with the other evidence. *See id.* at ¶ 15-16. We review de novo issues of law including whether a juvenile court misapplied a statute.

{¶51}   *Analysis for K.T.3.*  K.T.3 was born in May 2015, almost three years after HCJFS had commenced this action.  At the time of his birth, three of his half-siblings were in the temporary custody of HCJFS, and HCJFS sought permanent custody of him as the initial disposition in the complaint alleging that he was dependent.

{¶52}   When a children-services agency seeks permanent custody under R.C. 2151.353(A)(4) as an initial disposition for an abused, neglected or dependent child, without first seeking reunification, the juvenile court must apply a two-pronged test. The court must first determine whether "the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent," based on at least one factor enumerated under R.C. 2151.414(E).

{¶53}   As relevant to this case, the factors enumerated under R.C. 2151.414(E) provide

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code.

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate home for the child.

(10) The parent has abandoned the child.

{¶54} Additionally, if the court makes the cannot-or-should-not determination, it must also determine whether it is in the best interest of the child to grant permanent custody to the agency considering the factors in R.C. 2151.414(D)(1) with respect to the child.

{¶55} *"Cannot or should not."* In accordance with R.C. 2151.414(E), the juvenile court entered a finding that K.T.3 "cannot and should not be placed with the parents within a reasonable time." Although the court did not specify which of the R.C. 2151.414(E) factor or factors applied, the GAL argues, and we agree, that clear and convincing evidence supported the juvenile court's "cannot and should not" determination with respect to each parent.[1]

{¶56} First, there was clear and convincing evidence that Mother has a chronic mental illness that made her unable to provide an adequate permanent home for K.T.3 at the time of the custody hearing and as anticipated for one year after. *See* R.C. 2151.414(E)(2). The evidence showed that Mother suffered from a mental illness identified as paranoid-type schizophrenia, a mood and thought disorder that had led to her hospitalization and the involvement of HCJFS in 2012 when her children's safety was compromised.

{¶57} While Mother had finally become compliant with taking her medication, she still questioned her need for mental-health services, and failed to consistently obtain the mental-health services necessary for her mental-health stability. Her volatile behavior was born out in her arrest for disorderly conduct in

---

[1] We note that if a court grants permanent custody under R.C. 2151.353(A)(4), it "shall file a written opinion setting forth its findings of facts and conclusions of law in relation to the proceeding" if requested by any party. No request was filed in this case.

January 2016 and, importantly, in FNC's move of her supervised visits from her home to FNC's own facility in late 2017. At the time of the permanent-custody hearing, Mother could not provide an adequate and permanent home for K.T.3 due to her chronic mental illness.

{¶58} The juvenile court could not anticipate that Mother would be able to provide an adequate and permanent home for K.T.3 within one year. Despite the years of services offered by the agency to reunite Mother with K.T.3's half-siblings, K.T.1, A.T. and K.T.2, almost three years when the agency filed K.T.3's complaint, Mother had failed continuously and repeatedly to substantially remedy these conditions, causing K.T.3 to be placed outside the home. Mother's plan for reunification with her older children required her consistent participation in mental-health services for her schizophrenia, which she failed to do, for a period of almost six years at the time of the May 2018 remand hearing.

{¶59} Mother had become compliant with taking her medication after multiple years of noncompliance, but she still remained noncompliant with reunification services designed to give her the stability she needed to parent: mental-health services, including regular attendance at mental-health therapy and regular appointments with her treating psychiatrist. And the evidence, including Mother's own testimony, indicated that she still waivered in her understanding and acknowledgment of her mental illness. Mother's inability to progress beyond visitation in a supervised setting was in large part due, directly and indirectly, to her failure to adequately address her mental illness, as well as her cognitive disabilities. This lack of progress greatly reduced the chance that Mother could provide an adequate and permanent home for K.T.3 within one year.

{¶60} Finally, with respect to K.T.3's alleged father, L.D., there was clear and convincing evidence that he had abandoned K.T.3. The evidence showed that he had refused a paternity test, had no involvement with K.T.3., never engaged in any services requested by HCJFS, and stopped responding to HCJFS's communications in 2016.

{¶61} *Best-interest determination.* In addition to determining that K.T.3 could not or should not be returned to either parent within a reasonable time, the juvenile court determined, after considering all of the factors of R.C. 2151.414(D)(1)(a)-(e), that a grant of permanent custody to HCJFS was in K.T.3's best interest. That determination was supported by clear and convincing evidence.

{¶62} Of relevance, the evidence showed that K.T.3 had been removed from Mother within days of his birth and placed in a foster home with K.T.2 where he was healthy and lived happily with his foster family. While there was evidence that Mother had bonded with K.T.3 during visitation, the bond was not strong.

{¶63} During the years that K.T.3 has been in the agency's custody, Mother never progressed beyond supervised visitation with him, had not remedied the mental-health issues that prompted his removal, and had not demonstrated an ability to provide K.T.3 with long-term stability.

{¶64} The evidence also showed that K.T.3 was healthy, happy, and bonded with his foster family. At the time of the permanent-custody hearing in the spring of 2017, K.T.3 had been living with his foster family for two years. He was still residing with them at the time of the remand hearing in May 2018.

{¶65} K.T.3's foster mother reported that K.T.3 had a strong bond with her, her family, and K.T.2. She testified that, if given the opportunity, she would adopt

K.T.2, and was committed to maintaining a relationship between the siblings. Further, she said that the more time K.T.3 spent in her care made it more likely that she would commit to adopting K.T.3, too.

{¶66} K.T.3 had no bond with his alleged father, L.D., who had abandoned him. The GAL consistently urged the court to award permanent custody to HCJFS, although K.T.3 was not old enough to express his wishes.

{¶67} Finally, the evidence showed that K.T.3 needs a legally secure permanent placement that is only possible with a grant of permanent custody to the agency. His parents are not suitable and no family members have moved for custody.

{¶68} After our review, we hold that the juvenile court's determinations are supported by clear and convincing evidence, and are not against the manifest weight of that evidence. The record reflects that K.T.3 cannot be placed with either parent with a reasonable time, or should not be placed with either parent, since Mother still has not obtained mental-health stability and remedied the conditions that led to K.T.3's removal, and L.D. has refused to participate in the case. Further, it is in K.T.3's best interest, after what is now over three years of temporary custody, to be placed in the permanent custody of the agency so that he may be adopted.

{¶69} *Analysis for K.T.1, A.T., and K.T.2.* The combined permanent-custody hearing also involved motions to modify the agency's temporary custody of K.T.1, A.T., and K.T.2 to permanent custody.[2] R.C. 2151.414 provides that, with a few exceptions, before a juvenile court may terminate parental rights and place children in the permanent custody of a children-services agency, it must make two

---

[2] We apply the version of the applicable statutes in effect when the March 2015 and June 2016 permanent-custody motions were filed.

determinations. The court must determine whether one of the five factors set forth in R.C. 2151.414(B)(1) applies, including:

(d) The child has been in the temporary custody of one or more public services agencies or private child placing agencies for twelve or more months of a consecutive twenty two month period * * *.

{¶70} If one or more R.C. 2151.414(B)(1) factors apply, the court must determine whether it is in the child's best interest to grant permanent custody to the agency. Both determinations must be supported by clear and convincing evidence. R.C. 2151.414(B)(1).

{¶71} *12 of 22.* First, clear and convincing evidence supported the juvenile court's determination that K.T.1, A.T., and K.T.2 had been in the temporary custody of HCJFS for 12 or more months of a consecutive 22-month period at the time the relevant motions for permanent custody were filed. The GAL filed her motion with respect to K.T.1, A.T., and K.T.2 in March 2015, and HCJFS filed a new motion to change temporary custody of K.T.1 and A.T. to permanent custody in June 2016. By statute, for purposes of calculating the time provision of R.C. 2151.414(B)(1)(d), we look to the date each child was adjudicated dependent, or the date that is 60 days after the child was removed from home, whichever is earlier. The earlier date is August 2012 for K.T.1 and A.T, and March 2013 for K.T.2., and the children were continuously in the temporary custody of HCJFS from those dates, meeting the "12 of 22" criterion of R.C. 2151.414(B)(1)(d).

{¶72} *Best-interest determination.* Mother challenges the juvenile court's best-interest determinations with respect to K.T.2 and K.T.3. W.A. challenges the best-interest determination with respect to K.T.2., which resulted in an award of

permanent custody to the agency. He also challenges the best-interest determination respect to K.T.1 and A.T., which resulted in Mother obtaining legal custody of those children. The GAL contends that the juvenile court's best-interest determination with respect to K.T.2 that supported a termination of parental rights was sustained by sufficient and unassailable evidence, and that the juvenile court erred by not making a similar determination with respect to K.T.1 and A.T. based on similar evidence. Additionally, the GAL argues, as she did below, that the juvenile court was required to find that it was in the best interest of K.T.1, A.T., K.T.2 to be committed to the permanent custody of the agency and to commit the children to the permanent custody of HCJFS based on the provisions of R.C. 2151.414(D)(2).

{¶73} R.C. 2151.414(D)(2) sets forth an alternative set of circumstances for the juvenile court to find that permanent custody is "per se" in the best interest of the child. *In re J.R.*, 10th Dist. Franklin No. 17AP-698, 2018-Ohio-1474, ¶ 41. This statute provides that

[i]f all of the following apply, permanent custody is in the best interest of the child, and the court *shall* commit the child to the permanent custody of a public children services agency or private child placing agency:

(a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.

(c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

(Emphasis added.) R.C. 2151.414(D)(2).

{¶74}   If all of the requirements of R.C. 2151.414(D)(2) are satisfied, then the juvenile court **must** grant the permanent-custody motion. *In re C.M.,* 1st Dist. Hamilton Nos. C-150365 and C-150396, 2015-Ohio-3971, ¶ 14; *In re K.M.D.,* 4th Dist. Ross No. 11CA3289, 2012-Ohio-755, ¶ 30.   In this case, there was no dispute that the latter three factors had been met with respect to K.T.1, A.T., and K.T.2.   The children had been in HCJFS's custody for well over two years at the time of the permanent-custody hearing and no longer qualified for temporary custody; they were too young (under 16) to qualify for a planned permanent living arrangement; and there was no other motion for legal custody of them.   Therefore, the only remaining inquiry is whether the first factor had been met.

{¶75}   That inquiry requires us to revisit the "cannot and should not" factors of R.C. 2151.414(E).   If at least one factor under division (E) exists, and the child "cannot be placed with either parent within a reasonable time or should not be placed with the parents," permanent custody must be granted to the agency.

{¶76} Here, the juvenile court determined with respect to W.A. that he had abandoned his children, citing the factor in division (E)(10). That determination was supported by clear and convincing evidence. Of relevance to this case, a presumption of abandonment arises when a parent fails to visit or maintain contact with a child for more than 90 days, even if the parent resumes contact with the child after that period of 90 days. R.C. 2151.011(C). The evidence showed in this case that W.A. went years without visiting or contacting K.T.1, A.T., and K.T.2, whom he believed were his children.

{¶77} From the time of K.T.1's and A.T.'s removal in June 2012 until February 2016, W.A. did not attempt to make contact with either child. Similarly, W.A. did not attempt to make contact with K.T.2, born in January 2013, until February 2016. Accepting W.A.'s statement in the SODA report that he was unaware of the agency's involvement, or accepting his statement in the FAIR report that he was aware of the agency's involvement, there is no evidence that he attempted to contact these children through Mother or the agency.

{¶78} Further, the record shows that W.A. has stopped visiting these children, even after DNA testing established his parentage. At the time of the remand hearing in May 2018, W.A. had been removed from the visitation schedule at FNC for failing to attend visits, his last visit having occurred in November 2017, a period well over 90 days.

{¶79} Notwithstanding this unrefuted evidence, W.A. argues he rebutted the presumption of abandonment because the evidence undisputedly demonstrates that he immediately engaged in visitation with K.T.1, A.T., and K.T.2 in 2016 after paternity was established. We cannot find error in the juvenile court's ultimate

conclusion that the evidence clearly and convincingly supported a finding of abandonment. The presumption of abandonment is not rebutted by the mere fact that the father had not established paternity during the period when he did not visit the child. *See In re K.R.,* 12th Dist. Warren No. CA2017-02-015, CA2017-02-019 and CA2017-02-024, 2017-Ohio-7122, ¶ 32-33.

{¶80} W.A.'s failure to even attempt to contact the children who he had held out as his own was prolonged, spanning years. And his more recent disappearance from their lives, after paternity was established, occurred at perhaps the most relevant time in the case for determining his long-term commitment to these children and their best interests.

{¶81} In addition to finding that W.A. had abandoned the children under R.C. 2151.414(E)(10), the juvenile court also concluded, that he "clear[ly] lack[ed] []commitment to the Children by failing to regularly support, visit, or communicate with the children," language that mirrors the factor set forth in R.C. 2151.414(E)(4). Therefore the court's determination that the children could not be placed with W.A. within a reasonable time or should not be placed with W.A. was established by clear and convincing evidence.

{¶82} The R.C. 2151.414(E) analysis with respect to Mother is more complicated. While the juvenile court made a specific finding that a sibling, K.T.3, could not be returned to Mother within a reasonable time or should not be returned to Mother, the juvenile court did not make this specific determination with respect to K.T.1, A.T., or K.T.2. The GAL argues that due to the facts in this case, the evidence supporting the finding with respect to K.T.3 clearly and convincingly demonstrated

that K.T.1, A.T., and K.T.2 could not be returned to Mother within a reasonable time or should not be returned to Mother. We agree.

{¶83} We concur with the GAL, because the facts of this case do not allow for any other determination. K.T.3's case was tried on a complaint indicating that his removal from Mother's care was necessary because Mother had not complied with services offered to allow for her reunification with K.T.1, A.T., and K.T.2. Mother's reunification plan required her consistent participation in mental-health services to stabilize her mental health, including therapy and regular visits with her psychiatrist, and taking her prescribed medication. We have already discussed why the evidence of Mother's failure to remediate the reasons for K.T.3's removal resulted in an appropriate finding that K.T.3 could not be returned to Mother within a reasonable time or should not be returned to Mother. Ultimately, without Mother's consistent participation in services, adherence to her prescribed medication, and a clear understanding of her need for mental-health treatment, she would continue on the path of instability that had threatened her children's well-being and led to their initial removal and adjudication of dependency.

{¶84} The threat from Mother's mental-health instability remains not just for K.T.3, but for K.T.1, A.T., and K.T.2, too. These children are now only eight, seven, and five years old respectively, and are far too young to self-protect. The record does not contain any evidence that K.T.3 is more at risk. He has no special needs that would involve additional parental care. Essentially, there was no evidentiary basis for a determination that K.T.1 and A.T. should be placed with Mother or that K.T.2 could be placed with Mother. *See In re C.M.,* 1st Dist. Hamilton Nos. C-150365 and C-150396, 2015-Ohio-3971; *compare In re G.K.*, 12th Dist. Preble

Nos. CA2015-01-006 and CA2015-02-007, 2015-Ohio-2581, ¶ 40 (Evidentiary basis existed to support juvenile court's decision granting permanent custody of three-year-old autistic child to a children's services agency when the court had previously determined that an older brother could be returned to the same mother within a reasonable time, including ten-year age difference, younger child's more severe medical problems, and the older child's relationship with grandparents and his bonding with mother, who had a history of addiction and mental-health issues.).

{¶85}   Under these circumstances, we conclude that the juvenile court erred when it determined that K.T.3 cannot and should not be returned to Mother within a reasonable time, but failed to make the same determination with respect to K.T.1, A.T., and K.T.2., and then failed to apply R.C. 2151.414(D)(2).[3]

{¶86}   In summary, because the condition of R.C. 2151.414(B)(1)(d) and all the conditions of R.C. 2151.414(D)(2) were established by clear and convincing evidence with respect to K.T.1, A.T., and K.T.2, the juvenile court erred by not committing them to the permanent custody of HCJFS on this basis, as required by statute.  For this reason, we sustain the GAL's assignments of error.  And because of this disposition, we overrule W.A.'s second and third assignments of error and the remainder of Mother's sole assignment of error.

---

[3] The juvenile court did not address the application of R.C. 2151.414(D)(2) in its judgment.  It found, instead, that the remand of custody of K.T.1 and A.T. to Mother was in their best interest, in part so they could be permanently placed in the same home, a result the court deemed possible only with a remand of custody to Mother.  Part of the court's analysis was based on its erroneous finding that K.T.1 and A.T. had not been placed in the same foster home together.  We do not need to review the court's best-interest analysis with respect to either parent, however, because reunification within a reasonable time was not possible and the requirement of R.C. 2151.414(D)(2) applied.

## Conclusion

{¶87}   We affirm the juvenile court's judgment to the extent that it granted permanent custody of K.T.2 and K.T.3 to HCJFS, reverse the judgment to the extent that it failed to grant permanent custody of K.T.1 and A.T. to HCJFS on the GAL's March 2015 motion, and enter judgment granting permanent custody of K.T.1 and A.T. to HCJFS.

Judgment accordingly.

ZAYAS AND MILLER, JJ., concur.


Please note:

The court has recorded its own entry this date.