[Cite as *In re J/B Children*, 2020-Ohio-1085.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: J/B CHILDREN | : | APPEAL NO. C-190651 |
| | | TRIAL NO. F-16-1241 |
| | : | *O P I N I O N.* |

Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  March 24, 2020

*James A. Anzelmo,* for Appellant Mother,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Alyssa M. Miller*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Kimberly A. Helfrich*, Assistant Public Defender, Guardian ad Litem for T.J.,

*Phyllis Schiff,* Attorney for T.J.

**CROUSE, Judge.**

{¶1}   Mother appeals from a judgment of the Hamilton County Juvenile Court that terminated her parental rights and placed T.J. in the permanent custody of the Hamilton County Department of Job and Family Services ("HCJFS"). For the reasons set forth below, we affirm the juvenile court's judgment.

### I. Factual and Procedural Background

{¶2}   Mother is the natural parent of T.J., born September 16, 2002. HCJFS opened a case against mother in May 2016 after receiving reports from T.J.'s school personnel that expressed concerns for T.J.'s well-being. T.J. reported to the school that mother had abused her in the past, and due to the abuse, T.J. was afraid to go home. T.J. also reported to the school that the thought of going home caused suicidal ideations. Mother initially agreed to a safety plan which placed T.J. in a group home. However, mother revoked the safety plan after four days. When mother revoked the plan, T.J. repeated her fear of going home and HCJFS obtained an emergency order from the juvenile court.

{¶3}   On April 24, 2017, the juvenile court adjudicated T.J. neglected and abused. On July 31, 2017, the court granted HCJFS temporary custody of T.J. Mother's case-plan services included visitation, parenting classes, individual therapy, family therapy, and participation in T.J.'s treatment plan. Mother successfully completed parenting classes and individual therapy. However, mother did not complete family therapy or visitation. Mother attended two sessions of family therapy and approximately five months of visitation. Both services were eventually discontinued due to argumentative behaviors from mother that physically upset T.J. When HCJFS reinstated those services in February 2018, mother participated in only two visits. Mother also did not substantially participate in treatment team meetings.

Over the course of two years, mother attended less than ten of an estimated 40 meetings.

{¶4}    While in HCJFS custody, T.J. was placed in multiple locations, including a residential facility in Cincinnati, a residential facility in Columbus, three group homes in Cincinnati, and three foster homes in Cincinnati.  Throughout these placements, T.J. was hospitalized four times for suicidal ideation and occasionally homicidal ideation.  At the time of trial, T.J. had been diagnosed with posttraumatic stress disorder, specified depressive disorder, and pragmatic language disorder.

{¶5}    On February 28, 2018, HCJFS moved to modify temporary custody to permanent custody.  The juvenile court conducted hearings on the motion on August 19, 2019, and September 17, 2019.  On November 1, 2019, the court granted HCJFS permanent custody of T.J.

{¶6}    Mother filed this timely appeal, raising four assignments of error for our review.

## II.  Motion for a Continuance

{¶7}    In her first assignment of error, mother argues that the juvenile court abused its discretion by denying her motion for a continuance.

{¶8}    The denial of a continuance is within the sound discretion of the trial judge.  *State v. Ungar*, 67 Ohio St.2d 65, 67, 423 N.E.2d 1078 (1981).  An appellate court will not reverse the denial of a continuance absent an abuse of discretion.  *Id.*

{¶9}    In evaluating a motion for a continuance, the court should balance all of the competing considerations.  *Id.* at 68 ("Weighed against any potential prejudice to a defendant are concerns such as a court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice.").  The court should consider:

the length of the delay requested, whether other continuances have been requested and received, the inconvenience to litigants, witnesses, opposing counsel and the court, the reason for the delay, whether the party contributed to the circumstances which give rise to the request for a continuance, and any other relevant factors depending on the circumstances of each case.

*In re E.A.*, 1st Dist. Hamilton No. C-130041, 2014-Ohio-280, ¶ 5.

{¶10} A review of the record demonstrates that the juvenile court properly considered all relevant factors and did not abuse its discretion in refusing to grant a continuance. On August 13, 2019, mother moved for a continuance of the trial scheduled for August 19, 2019. Mother based her request on a supplemental case plan filed on August 6, 2019, and supplemental discovery responses sent on July 29, 2019.

{¶11} With respect to the filing of the case plan, the juvenile court found it to be irrelevant to the permanent-custody hearing. Specifically, the court stated that "a case plan is in the nature of an administrative document" and "[i]t's not part of the fact finding that goes along with the dependency complaint for the ultimate disposition." For these reasons, the court declined to grant a continuance based on the filing of the case plan.

{¶12} With respect to the supplemental discovery responses, mother contended that she did not have time to "look at it, respond to it, [or] have a defense to it." However, the supplemental discovery consisted only of an updated witness list, and HCJFS emailed it to mother 21 days before trial. Further, the record is devoid of any indication of the length of delay requested by mother. There was no

4

proposed trial date or any suggestion of how long it would have taken mother to review the discovery.

{¶13} Although mother requested only one continuance, a review of the record reveals that she made in excess of 50 filings with the juvenile court throughout the course of litigation. These filings included several motions to dismiss, numerous objections to HCJFS administrative documents, a myriad of objections to the magistrate's decisions, three appeals to this court, and at least one grievance with the Ohio Supreme Court. An email between mother and the guardian ad litem ("GAL") admitted into evidence at trial reveals that mother made these filings with the intent to take the case "all the way to the end [for] entertainment purposes" and to draw out the process until T.J. reached the age of 18.

{¶14} In considering the inconvenience to those involved, the court heard from the HCJFS attorney, the GAL, and the attorney for T.J. The HCJFS attorney objected to a continuance on the grounds of inconvenience to witnesses. Specifically, the HCJFS attorney stated, "I have witnesses that are scheduled to be here every hour today. They are all professional witnesses. The first one is set to be here in about 20 minutes." The GAL also objected to a continuance on the grounds of mother's previous dilatory tactics. Finally, the attorney for T.J., who was appointed two months prior, stated that she did not need a continuance.

{¶15} Based on the foregoing, the juvenile court did not abuse its discretion by denying mother's motion for a continuance. Mother's first assignment of error is overruled.

### III. Right to Assistance of Counsel

{¶16} In her second assignment of error, mother argues that the juvenile court deprived her of the right to assistance of counsel during all stages of the proceeding.

{¶17} Parents have a right to counsel in parental-termination cases. *In re R.K.*, 152 Ohio St.3d 316, 2018-Ohio-23, 95 N.E.3d 394, syllabus; *see* R.C. 2151.352; Juv.R. 4(A). However, the right to counsel in permanent-custody proceedings is not absolute. A parent can waive his or her right to counsel. *In re M Children*, 1st Dist. Hamilton No. C-180564, 2019-Ohio-484. ¶ 15. In determining whether a parent has expressly waived the right to counsel, we consider whether the waiver was voluntarily, knowingly, and intelligently made. *Id.*

{¶18} Throughout this case, the magistrate appointed counsel for mother three times. All three attorneys moved to withdraw within a few months of their appointment. The magistrate permitted mother's first and second counsel to withdraw due to irreparable harm to the attorney-client relationship and mother's request for new counsel. The magistrate permitted mother's third counsel to withdraw due to irreconcilable differences. After mother's third counsel withdrew, the magistrate appointed a fourth attorney to act "as legal consultant to [mother] only." Mother's legal consultant eventually moved to withdraw, citing irreconcilable differences and an ethical conflict due to his limited position. The juvenile court approved the motion and referred mother to the Public Defender's Office. However, mother continued to file motions pro se and appeared without counsel at all of the remaining hearings.

{¶19} At a hearing on February 13, 2019, the juvenile court engaged mother in a colloquy to determine whether she wanted to waive her right to counsel. The

court inquired into whether mother had sought counsel and urged mother to do so when she responded, "No." The parties then chose a date for trial on HCJFS's permanent-custody motion.

{¶20} Thereafter, the following dialogue occurred:

Court: Now, [mother], as I indicated to you, please, please go back to the Public Defender's Office and see if they'll appoint counsel for you. If you do choose to go forward representing yourself, I can help you procedurally, * * * but I can't help you defend your case. Do you understand that?

Mother: I'm fine with that.

Mother then asked several questions, to which the court responded,

[T]hese are the kinds of things why I – I really want you to have an attorney. Because I don't think you understand, first of all, how long a trial like this can go. I mean, it can go several days. And, secondly, I want you to be crystal clear what's at stake here and how to defend the claims against you. I know that you are very articulate and I know that you're very invested in your child, but you're in a framework now that you have not been trained to operate in. And there's rules of evidence, there's rules of procedure that I can't bend for you. As I indicated, I will help you understand procedurally where we're at, but I can't help you defend your case.

Mother unequivocally replied, "I'm going to represent myself."

{¶21} At the close of the February 13 hearing, the court again urged mother to seek counsel, stating:

This isn't about what kind of medication [T.J.'s] taking or what facility she's living in. This is about whether or not you lose your child. As I said, it's the most serious case this Court handles. So I don't know what else I can say to you to impress upon you how important it is that you at least go to the Public Defender's Office and see if they will reappoint counsel for you. If you – if you choose to go forward by yourself, it's going to be difficult. That's the best I can tell you.

In its entry, the court expressly permitted the Public Defender's Office to appoint a fourth counsel for mother, but stopped short of directing them to do so "because mother has been adamant that she wants to represent herself."

{¶22} It is clear from the record that the juvenile court explained to mother that she would be responsible for defending her case and warned her of the dangers of self-representation. The court even acknowledged mother's lack of legal training and persistently urged mother to obtain counsel. However, mother not only showed an unwillingness to obtain new counsel, but she also told the court, "I'm going to represent myself." Mother subsequently appeared at the permanent-custody hearing pro se and actively participated in the hearing. Under these circumstances, we find that mother expressly waived her right to counsel and that the waiver was voluntarily, knowingly, and intelligently made.

{¶23} Mother's second assignment of error is overruled.

### IV. Best Interest of the Child

{¶24} In two related assignments of error, mother asserts that the record does not support the juvenile court's conclusion that a grant of permanent custody to HCJFS was in T.J.'s best interest. In her third assignment of error, mother argues that the juvenile court failed to consider all of the best-interest factors where its

8

decision referenced only R.C. 2151.414(D)(1)(b) and offered no explicit comment on the remaining R.C. 2151.414(D)(1) factors. In her fourth assignment of error, mother contends that HCJFS failed to establish by clear and convincing evidence that it should be awarded permanent custody of T.J.

{¶25} A juvenile court's determination to award permanent custody must be supported by clear and convincing evidence. *In re W.W.,* 1st Dist. Hamilton No. C-110363, 2011-Ohio-4912, ¶ 46. In reviewing a juvenile court's permanent-custody determination, we must examine the record and determine if the juvenile court had sufficient evidence before it to satisfy the clear-and-convincing standard. *Id.*

{¶26} R.C. 2151.414 governs the findings the juvenile court must make before granting permanent custody of a child to a children services agency. Under R.C. 2151.414(B), the juvenile court may grant a motion for permanent custody if the court determines that permanent custody is in the best interest of the child and that one of the five conditions set forth in R.C. 2151.414(B)(1) applies.

{¶27} In determining the best interest of the child, R.C. 2151.414(D)(1) requires the juvenile court to consider all relevant factors, including, but not limited to, five mandatory factors. These factors include (a) "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers"; (b) "[t]he wishes of the child"; (c) "[t]he custodial history of the child"; (d) "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency"; and (e) "[w]hether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(D)(1).

{¶28} "But there is no requirement that the trial court discuss the application of each statutory factor it has considered." *In re A.M.*, 1st Dist. Hamilton No. C-190027, 2019-Ohio-2028, *appeal accepted*, 157 Ohio St.3d 1406, 2019-Ohio-3731, 131 N.E.3d 77. "We strongly encourage the juvenile court's discussion of each factor, but we cannot find error in the juvenile court's failure to discuss each factor if the record otherwise indicates that all of the necessary factors were considered." *In re K.T.1 II*, 2018-Ohio-4312, 121 N.E.3d 847, ¶ 46 (1st Dist.).

{¶29} In *In re A.M.*, the dissent took issue with "the magistrate and juvenile court's collective failure to actually explain their decisions." *In re A.M.* at ¶ 41. The dissent was specifically concerned with the fact that the magistrate's order recited the statutory language of R.C. 2151.414(D)(1) but offered no analysis, discussion, or factual findings. *Id.* at ¶ 45. The dissent argued that the juvenile court should be required to make the appropriate factual findings to enable us to conduct meaningful appellate review. *Id.* at ¶ 41.

{¶30} Here, however, the juvenile court did make factual findings relevant to an analysis under each best-interest factor, despite the fact that it did not expressly cite each statutory factor. While it would have been helpful to this court and the parties for the juvenile court to cite each statutory factor in its analysis, the failure to do so did not preclude meaningful appellate review where the court otherwise engaged in a thorough analysis.

{¶31} With respect to the child's interaction and interrelationship with others (R.C. 2151.414(D)(1)(a)), the court found that the root problem appeared to be T.J.'s relationship with mother. The court noted, "When T.J. most needs the stable support of a nurturing parent, mother responds by being uncooperative with the treating professionals * * *[,] hostile to the HCJFS personnel, and effectively

becomes a roadblock to the child's stabilization." As an example, the court cited an instance where mother indicated to T.J. that she would sign a permanent surrender of parental rights at a critical point in T.J.'s treatment process. However, mother later admitted to the GAL that she never intended to surrender her parental rights and that she "will tell [T.J.] what ever she wants and needs to hear." The court also mentioned that "[v]isitation became more detrimental to the child than helpful and finally visits were suspended for a period of time." Based on the foregoing, the court concluded that "mother is unable or unwilling to acknowledge the severity of the child's mental health issues, and in light of that lack of understanding, frustrates treatment – and causes increased tension in her relationship with her daughter."

{¶32} A review of the record further details T.J.'s interaction and interrelationship with her siblings and out-of-home providers. At trial, T.J.'s group-home therapist testified that family-related issues caused stress for T.J. For example, the GAL testified to an incident where T.J.'s sister chastised T.J. for her poor relationship with mother. Several hours later, T.J. expressed suicidal ideations to the staff at her group home and she was hospitalized. With respect to out-of-home providers, T.J.'s group-home therapist testified that the group home provided T.J. a reasonably stable living environment. In the four months leading up to trial, T.J. had reduced the number of suicide attempts, reduced the number of hospitalizations, experienced success with peers and staff in the group home, and experienced success in school.

{¶33} In considering the wishes of the child, the court expressly cited R.C. 2151.414(D)(1)(b). With regard to this factor, the court found that the GAL and the attorney for T.J. "unanimously and repeatedly expressed the child's adamant desire to be permanently committed to HCJFS and possibly adopted."

11

{¶34} The court also considered the custodial history of the child (R.C. 2151.414(D)(1)(c)). The court determined that, when HCJFS moved for permanent custody, T.J. had been in HCJFS placement for over 19 months.

{¶35} With respect to the child's need for legally secure placement (R.C. 2151.414(D)(1)(d)), the court found that "no one from the family has stepped forward to offer T.J. any alternative to the toxic environment mother would provide." The court noted that, despite telephone contact with T.J., T.J.'s alleged father had not participated in the case, had never sought custody, and had never proposed an alternative to HCJFS custody. In addition, the court mentioned that one relative briefly appeared and expressed interest in seeking custody of T.J. However, "that relative never followed through and her home situation * * * did not appear to be a viable alternative at the time she testified." Furthermore, the court discussed Planned Permanent Living Arrangement as a "preferable disposition – except that mother would retain the ability to continue to frustrate and delay any efforts to meet T.J.'s needs."

{¶36} A review of the record further details T.J.'s need for legally secure placement. At the time of trial, HCJFS had provided T.J. a secure and stable placement. T.J.'s group-home placement offered her individual therapy, group therapy, med-som services, a mentor, and case-management services. In HCJFS custody, T.J. can continue these services until the age of 21.

{¶37} The court also considered the applicability of R.C. 2151.414(E)(8). Provision (E)(8) of R.C. 2151.414 examines whether the parent has withheld medical treatment from the child. Here, the court found that mother's refusal to cooperate with providers and her continuous objections to case plans delayed or frustrated T.J.'s needed services. As an example, the court noted that mother objected to each

12

new case plan, "involving things as basic as changes in medication recommended by the treating physicians," and necessitated a hearing "to approve virtually every effort to address T.J.'s continuing and worsening mental health needs."

{¶38} Under these circumstances, we find that the juvenile court properly considered all of the relevant factors, despite expressly citing only one of the five enumerated factors in R.C. 2151.414(D)(1) in its decision. Furthermore, we hold that clear and convincing evidence supports the court's determination that a grant of permanent custody was in T.J.'s best interest.

{¶39} Mother's third and fourth assignments of error are overruled.

### V. Conclusion

{¶40} For the foregoing reasons, mother's assignments of error are overruled and the judgment of the juvenile court is affirmed.

Judgment affirmed.

**ZAYAS, P.J.,** and **MYERS, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.

13