[Cite as *In re G.A.* , 2020-Ohio-1120.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

IN RE G.A.

A Minor Child

[Appeal by Ta.E., Mother]

:
:
:
:
:
:

No. 108932

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 23, 2020

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD 15912941, AD 15912942, AD 15912943, and AD 15912944

---

### *Appearances:*

Milton A. Kramer Law Clinic Center, Andrew S. Pollis, and
Chelsea R. Fletcher and Emily Peterson, Certified Legal
Interns, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Brittany E. Leach, Assistant Prosecuting
Attorney, *for appellee.*

MARY J. BOYLE, P.J.:

{¶ 1} Appellant, Ta.E. ("mother"), appeals the juvenile court's judgment granting permanent custody of her daughter, G.A. (d.o.b. Dec. 28, 2007, 11 years old at the time of the permanent custody hearing) to the Cuyahoga County Department

of Children and Family Services ("CCDCFS" or "the agency").[1]  Mother raises one

assignment of error for our review:

> The juvenile court erred in granting the agency's motion for permanent
> custody [of G.A.].

{¶ 2}  Finding no merit to mother's appeal, we affirm.

## I. Procedural History and Factual Background

{¶ 3}  CCDCFS received emergency custody of G.A. (and her three younger

siblings) on September 17, 2015, after mother was arrested for child endangering

and domestic violence.  CCDCFS alleged that G.R. and T.E. had "linear scars on their

bodies."  G.R. also had "scars across his back, chest, stomach, neck, and face."  T.E.

also had "scars on his back and chest."  CCDCFS alleged that mother suffered from

mental health diagnoses, which interfered with her ability to care for her children.

In its complaint, CCDCFS alleged that all of the children were dependent, that T.E.

was abused, and that G.R. was abused and neglected.  The court appointed a

guardian ad litem ("GAL") for the children.

{¶ 4}  At an adjudication hearing on January 6, 2016, mother stipulated to

an amended complaint, which removed T.E. from the abuse allegations.  The

juvenile court found G.R. to be abused and the remaining children to be dependent.

Mother's case plan included parenting, anger management, and mental health

---

[1] The juvenile court also granted permanent custody of mother's other three children to the agency at the same time: G.R., d.o.b. Feb. 21, 2009, T.E., d.o.b. May 1, 2011, and C.E., d.o.b. May 31, 2013.  Mother is not challenging the juvenile court's grant of permanent custody to the agency with respect to these three children.

services. At that time, the permanency plan for the children was for them to be reunified with mother.

{¶ 5} The juvenile court held a dispositional hearing on February 17, 2016, where mother agreed that the children should be placed in the temporary custody of the agency. The magistrate's dispositional order was approved and adopted by the juvenile court on March 5, 2016.

{¶ 6} On June 21, 2016, the agency filed a motion to modify temporary custody of the children to permanent custody. The agency alleged that the children could not be placed with their parents within a reasonable time or should not be placed with their parents, and that one of the factors under R.C. 2151.414(E) applied. CCDCFS averred that mother pleaded guilty to third-degree felony child endangering and misdemeanor domestic violence in February 2016. She was sentenced to 30 months in prison on March 25, 2016. CCDCFS informed the court that mother was not scheduled to be released until September 2018. The agency further alleged that it would be in the children's best interests for it to be granted permanent custody.

{¶ 7} Before mother went to prison, she completed parenting and anger management programs and was compliant with her mental health services. Although mother completed her parenting and anger management classes, she was not able to demonstrate what she had learned with the children because of a no-contact order with the children that was in place in her criminal case. Mother was released from prison six months early, in March 2018.

**{¶ 8}** CCDCFS's permanent custody motion was set for trial on March 15, 2018 (it had already been continued several times). Mother appeared in court and requested a continuance on CCDCFS's permanent custody motion because she had just gotten out of prison and moved to a half-way house. Mother's attorney said that mother would be able to obtain housing through Eden, start visiting the children, and could "work her case plan." CCDCFS objected, stating that the motion had been pending since June 2016. The GAL indicated that it would be in the children's best interest to continue the matter, although she acknowledged the children were in need of permanency. The social worker explained that if the case was continued, the case plan would have to be amended to add housing and income. Mother would also have to demonstrate parenting skills, specifically that she could deal with all of the children's behaviors and mental health issues. Mother would also have to continue addressing her own mental health issues. The juvenile court granted mother's motion for continuance.

**A. GAL Report Before Trial**

**{¶ 9}** The GAL explained that G.A. had been placed with her siblings in a foster home in Youngstown, but that the foster mother asked that she be removed because she was acting aggressively and was "displaying sexually inappropriate behavior towards" her siblings. After that, G.A. was placed in a different foster home in Youngstown.

**{¶ 10}** According to the GAL, G.A. had behavioral problems at school. She also wet the bed at night. She was admitted to Belmont Pines for evaluation August

2 – 7, 2017. She had been diagnosed with PTSD and bipolar disorder. She takes medication and is very depressed. The foster mother reported that G.A. cries herself to sleep every night because she wanted to go home to her mother. She was receiving individual counseling. The GAL said that although G.A. wished to be returned to her mother, G.A.'s desire was not consistent.

{¶ 11} The GAL recommended that it was in G.A.'s best interest that the court grant permanent custody of G.A. to the agency but that "if it is possible, it may be in [G.A.'s] best interest if she is reunified with her mother." The GAL reserved her right to modify her recommendation.

**B. Permanent Custody Hearing**

{¶ 12} The trial on CCDCFS's permanent custody motion did not take place until August 1, 2019, over three years since the agency filed it and nearly four years after the children had been removed from mother's care. Present at the hearing were mother, mother's attorney, mother's GAL, CCDCFS's attorney, attorney for the father of G.A. and G.R., attorney for G.A. and G.R., GAL for the children, and the social worker assigned to the case since CCDCFS first obtained emergency custody of them on September 17, 2015. At the time of the hearing, G.A. was 11 years old, G.R. was 10 years old, T.E. was seven years old, and C.E. was six years old.

{¶ 13} The attorney for CCDCFS told the court that father for G.A. and G.R. had been in federal prison in New York throughout the case and the father for T.E. and C.E. had not had contact with the agency in a very long time nor had he worked on any part of his case plan. She also informed the court that the agency had

investigated relatives for possible placement of the children, but not one was a viable option. The social worker had investigated mother's stepmother, but her home was inappropriate. The social worker also spoke to a couple of mother's sisters and paternal grandmother for two of the children, and no one would accept placement of the children "because of their own family situations and income."

{¶ 14} Mother's counsel stated that mother disciplined G.R. inappropriately, but he explained that is how mother was disciplined when she was a child in the permanent custody of the state. Mother's counsel stated that mother has now learned that is not how you discipline children. He indicated that mother had also done all of the programming that was prescribed to her by CCDCFS as well as many programs in prison to better herself and had followed all of the rules of her probation. Mother's counsel explained that mother does not have an automobile and was "straining to get housing." He further stated that mother was also trying to get social security disability. Mother's counsel stated that mother had been visiting her children since she had gotten out of prison, although he admitted that there were some issues with visitation because the children were placed outside of the county. Mother's counsel said that because the visits had to be supervised due to her criminal case, mother was not able to "have any real closeness with her children," but he said that was not her fault. Mother's counsel further stated that at least one child wanted to be with mother.

{¶ 15} G.A.'s attorney told the court that G.A. wanted to be returned to mother's custody. G.A.'s attorney stated that mother had completed all of her case

plan services, and that the only barrier left was that mother had not been officially terminated from her parole. But G.A.'s attorney explained that was only because the Parole Authority had not completed the paperwork yet.

{¶ 16} The social worker explained that the children were removed from mother's custody after mother admitted to hitting G.R. with a telephone cord. Mother pleaded guilty to child endangering and spent almost two years in prison for it, from May 2016 to March 2018. When mother got out of prison, her case plan objectives included participating in mental health services, and family and individual counseling, and obtaining housing and income. According to the social worker, mother lost custody of an older child in 2004 or 2005 due to mother's anger issues and unstable housing.

{¶ 17} Regarding housing, the social worker stated that she had referred mother to Cuyahoga Metropolitan Housing Authority ("CMHA"). The social worker explained that she had been to mother's home in February 2019, and said it was appropriate at that time. The social worker stated, howver, that she attempted to see mother's home in July, just before trial, but mother would not let the social worker see her home because mother said she was moving. Mother told the social worker that she was "in the process of moving because she had to be out of her last place, and she was looking for housing." Mother further told the social worker that she could "come see her after she gets in her place." The social worker stated that she had not been able to verify if mother found new housing as of the time of trial. The social worker did hear a conversation that mother had with the children where

she told them she found housing, was waiting for it to be approved, and "should be able to move in this weekend." The social worker had not been able to verify if that was true before trial. Although the social worker testified that Eden had agreed to pay mother's rent for as long as she was in their program.

{¶ 18} Regarding income, the social worker reported that mother needed to be able to provide for the children's basic needs, including food, shelter, and clothing. When the children came into custody, their housing conditions were poor. The children were "unkempt." When the agency received custody of the children, they had bed bugs and lice. Mother was receiving SSI at that time, but was no longer receiving it. Mother was purportedly in the process of trying to get her SSI back. Mother told the social worker that she receives food stamps.

{¶ 19} The social worker testified that she had referred mother to a neighborhood collaborative, Fatima Family Center, and Eden, which helps people find a place to live and provides rental assistance. Mother also had a therapist and case manager at The Centers for Families and Children ("The Centers"). The social worker explained that the neighborhood collaborative and Fatima assisted mother with obtaining food donations. Mother's case manager at the collaborative assisted mother with job opportunities, community resources, and anything the family needed.

{¶ 20} Regarding mental health, mother had a history of mental health issues. She had been diagnosed with bipolar disorder and schizoaffective disorder. When the case opened in 2015, mother had not been compliant with her

medications. The social worker stated that mother was already connected to The Centers when the case opened and was adamant about staying with them. The social worker testified that she recommended that mother obtain mental health services from another source because mother had been working with a therapist at The Centers before she physically abused G.R. According to the social worker, the therapist informed her that mother's engagement had been "off and on" around that time and before mother physically abused G.R. The social worker explained that mother physically abused G.R. over time, not just in a single incident. G.R. had marks on him all over his chest, legs, and arms and some were new and some were old. Mother, however, refused to seek a different mental health provider.

{¶ 21} Mother was still receiving services through The Centers. The social worker verified that mother was currently compliant with her medications. Mother's longtime therapist was no longer able to work with mother as of June 2019, however, so mother had been assigned a new therapist. Mother met with the new therapist in June 2019, but did not see her in July due to scheduling conflicts.

{¶ 22} Regarding family and individual counseling, the social worker explained that mother struggled with G.R.'s mental health issues and behaviors when the case started. Plus, mother had been away from the children for almost two years while she was in prison, so CCDCFS added family counseling to mother's case plan. The social worker had explained that the children had "developed new behaviors" that mother needed to learn how to handle.

{¶ 23} According to the social worker, G.A. had been diagnosed with bipolar disorder and PTSD. G.A.'s foster parents had expressed that G.A. has "sexualized behaviors." G.A. had acted out sexually on her "siblings a couple of times to the point where a safety plan had to be put in place." G.A. also acted out sexually "on another foster child in a different foster home." G.A. also had "aggressive behaviors when it [came] to being compliant or following directives from an adult." Further, G.A. had a tendency to "shut down" and not talk about an issue that was occurring.

{¶ 24} G.R. had been diagnosed with ADHD, mild autism, and had an intellectual disability. G.R. had been smearing feces in the bathroom at his foster home, urinating on himself, and eating out of the trash.

{¶ 25} T.E. had been diagnosed with ADHD, oppositional defiant disorder, and PTSD. T.E.'s behavior had always been a "struggle" even before mother went to prison. T.E.'s behavior was still "very hard to control." T.E. would jump on the furniture and kick it. He also exhibited aggressive behaviors. But the social worker explained that T.E. had "calmed down a little bit" more recently.

{¶ 26} C.E. had been diagnosed with anxiety adjustment disorder, but was not on any medication.

{¶ 27} The social worker explained that all of the children except C.E. had been hospitalized for mental health reasons at Belmont Pines. G.A. had been hospitalized twice for suicidal ideation and self-harm. G.R. and T.E. had both been hospitalized once.

{¶ 28} The social worker testified that the children had been receiving individual counseling in Youngstown where they were placed in foster homes. Because of that the social worker set up family counseling at the same facility. It began in June 2018. The social worker scheduled the family counseling sessions for two times per month but they ended up only occurring once per month. The social worker explained that that was not mother's fault. The social worker further explained that at one pretrial, the family therapist indicated that she did not believe it was in the children's best interests to be reunified with mother because mother "did not demonstrate parental guidance." After hearing that, mother would no longer participate in family counseling sessions because she was upset with the therapist. Mother stopped going to family therapy in October 2018.

{¶ 29} The social worker tried to re-engage mother in family therapy in March 2019. The social worker set up an appointment for April 5, 2019, and informed mother about the appointment. Mother asked the social worker if she would call mother to remind her and the social worker said, "[n]o." The social worker told mother, "I'm telling you now, so write it down." Mother became very upset with the social worker and said that she did not want to work with her any longer. Mother told the social worker that she did not believe the social worker wanted her to get her children back. Mother also told the social worker that she was "just nasty" and not to "call her phone [any]more."

{¶ 30} The social worker also tried to re-engage mother in another family counseling program called Life Solutions. Life Solutions was even willing to provide

transportation to mother. They attempted to engage mother in the beginning of July 2019, but mother "was a no-show." The social worker also scheduled a therapist from Life Solutions to come to mother's visit with the children on July 17, 2019, to observe mother with the children "to have a better plan of working with her moving forward," but mother cancelled that visit with the children so it never occurred. But the social worker agreed that mother did eventually go to Life Solutions and talk to them and had an appointment to meet with them in the future.

{¶ 31} Regarding mother's visits with the children, the social worker explained that mother had not really been able to visit with the children while she was incarcerated in prison at the Ohio Reformatory for Women in Marysville, Ohio. Plus, mother had a no-contact order with the children due to her criminal case and her parole. Mother did have a handful of visits with the children once she got moved to "pre-release" because the juvenile court issued an order stating that mother shall have supervised visits with the children.

{¶ 32} When mother got out of prison, she had supervised visitation with the children. At first, the social worker scheduled the visits for four hours, twice per month. Two hours were with a parenting coach and two hours were with the social worker. At trial, the social worker testified that mother did not feel as if she was getting enough time with the children so they changed the visits to two hours once per week. At a pretrial in May 2018, however, the social worker told the court that it was because the four-hour visits had become too overwhelming for mother and she could not handle the children's behaviors in the four-hour visits. After the social

worker changed the visits to weekly, mother visited with the children two times per month and had family counseling sessions the other weeks.

{¶ 33} The social worker explained that the children were difficult to handle at the supervised visits and mother struggled with their behaviors. At one point, in May 2018, the parenting coach asked the social worker to talk in the hallway. When they went back in the room, mother insisted on knowing what they talked about in the hallway. The social worker told mother that she would talk to her about it after her visit with the children. Mother became very upset and said that the social worker talked to her like she was a child. Mother further referred to the social worker as a "b*tch," and said that if the social worker supervised her visits with her children, she would not come. At another visit, in May or June 2018, mother grabbed G.R. by his face to get his attention. The social worker immediately told mother she could not do that. Mother got angry at the social worker for "talk[ing] to her like she's a child." The social worker stated that T.E.'s behavior was just as out of control as G.R.'s, but mother would not get as frustrated with T.E. as she did with G.R.

{¶ 34} The social worker testified that mother missed three of four weekly visits in June and July 2019. Mother told the social worker that she thought she had pink eye in late June 2019. On July 10, 2019, mother said that she missed her visit because she had to move out of her home and look for a new one. Mother also missed a visit on July 17, 2019, because she said that she had an allergic reaction to something.

{¶ 35} Mother completed parenting classes and had a parenting coach. The social worker also gave mother parenting advice on how to approach her visitations with the children to help mother better handle the children during the visits.

{¶ 36} The social worker opined that as of the date of trial, mother could not effectively or consistently handle the children's behavior. Although she admitted that at a recent visit, mother had properly redirected G.R. when his behavior was inappropriate.

{¶ 37} The social worker opined that mother was not able to care for her children at the time of trial. She stated that she was not able to verify mother's housing or income. Mother had not engaged in family counseling since October 2018. The social worker explained that mother had not been able to have any unsupervised visits with the children due to her parole. But even if mother had been released from her parole, the social worker stated that she would not recommend reuniting mother with the children. Before she could recommend that, mother would first have to have unsupervised visits with the children, and if all went well, she would move to overnight visits, and if all went well, they could be reunified. But at that time, the social worker still would not recommend that mother have unsupervised visits with the children because of her lack of engagement in family counseling to obtain better tools to deal with the children's behaviors.

{¶ 38} With respect to G.A., the social worker explained that G.A. "has been back and forth with wanting to go home to her mom." The social worker said that she had concerns about mother's ability to handle G.A. because mother had not

engaged in family counseling to become more aware of what was occurring with G.A. When mother missed the three most recent visits, she learned that G.A. cried each time when mother did not show. The social worker testified that G.A. had just stated the day before trial that she did not know what she wanted. The court interviewed G.A. on April 11, 2019.

{¶ 39} Mother's parole officer testified on mother's behalf. She explained that mother was eligible for early release from postrelease control supervision effective July 7, 2019, but that there was only one person who handled the paperwork for early release so it had not yet been completed. But the parole officer said that mother had completed all aspects of her postrelease control and there was no reason to think she might not be released from it as soon as the paperwork could be processed.

{¶ 40} Mother's long-time therapist from The Centers also testified on mother's behalf. The therapist stated that she now worked at Life Solutions (since December 2018 but her last day at The Centers was June 15, 2019). She said that she became involved with mother and the children in 2007 or 2008 through Family Preservation as an intensive in-home case, providing therapeutic services to the family.[2] She explained that her work with the family was initially supposed to be for eight to 12 weeks, but mother became "an ongoing case" when that ended.

---

[2] G.A. and mother's older child (mother had already lost custody of this child) were the only children born at that time.

{¶ 41} Mother's therapist testified that before the children were removed from mother's care in September 2015, she and mother had "a break" in services where she was not able to get in contact with mother. Mother had called the therapist around that time to tell her that she had not been taking her medication and that she needed to get back on track. The therapist stated that mother had been consistent with her medication until "the last kid was born." She believed mother had post-partum depression after C.E. was born.

{¶ 42} The therapist explained that mother had a very unstable childhood and had received a lot of "maltreatment." Mother had continued to struggle with depression. But according to the therapist, mother had been consistent with her appointments since her release from prison. The therapist counseled mother on basic social skills, anger management, and the importance of listening to her children.

{¶ 43} The therapist told the court that mother had "expressed great displeasure with" CCDCFS. Mother did not feel as if she could communicate with her assigned worker. The therapist had seen mother interact with the children before and after prison. She believed that mother was "a great parent who's made some unwise decisions." The therapist stated that she did not know what else mother could "do to better parent her child or even become a better person."

{¶ 44} The therapist stated that her sister is in charge of facilitating workshops at Marysville prison. The therapist asked her sister to look after mother while she was at Marysville. Mother had no idea that the therapist's sister worked

there.  But according to the therapist, mother completed several workshops while she was in prison.  The therapist said that overall, "they have nothing but raving reviews to say about [mother] as most of those workshops were completed on her own accord.  They weren't mandated."  The therapist believed mother had benefited from therapy.

{¶ 45} The therapist testified that she thought that mother was scheduled to move "within the next day or so."  The therapist testified, however, that she had not seen mother since early June 2019.

{¶ 46} The therapist also admitted that when she went to observe one of mother's visitations with the children, mother got very upset with the social worker when she would not let the therapist talk to the children alone.  The social worker did not do so because the children were already in individual counseling.  Mother got angry with the social worker because mother wanted her therapist to talk to G.A. about her behavior and got very "irritable" that she could not.

{¶ 47} Since the therapist had been at Life Solutions, she had been asked to be a family counselor for mother and the children.  The therapist declined, however, and recommended someone else.  When asked why, the therapist stated, "Based upon my inability to effectively communicate with the CCJFS worker."  But the therapist admitted that despite their disagreement over the therapist meeting individually with the children and particularly G.A., the social worker was still willing to have the therapist or another counselor facilitate family counseling (just not individual counseling with the children).  The therapist was aware that mother

had an appointment scheduled for family therapy at Life Solutions with her new therapist, but said there "was a cancellation as recently as yesterday." The therapist explained the cancellation was due to mother's new therapist (not the one testifying) having an emergency.

{¶ 48} The therapist testified that she witnessed the social worker "dealing" with mother on two occasions in early June 2019. The therapist opined that the social worker was "very devaluing, dehumanizing, very dismissive" of mother. The therapist witnessed the social worker "walk away from [mother] several times. She turned her back on mother. There was a smacking of the lips and basically, you know, just a blow off." The therapist explained that during those occasions, she would try to redirect mother when she was speaking with the social worker because the therapist was "aware that [mother] has explosive moments" and "some anger management concerns." The therapist said that the social worker was not happy that this was happening in early June and said to the therapist, "very clearly this should have occurred back in January or February."

{¶ 49} The GAL for the children testified that she had been on the case since September 2015. She recommended that permanent custody be granted to CCDCFS for G.R., T.E., and C.E. They all had significant behavioral problems, but the foster mother "works very well with these children." These three children had never wavered in their desire to remain in this placement. The GAL stated that the foster mother would not adopt the children due to her age, but she said the children could remain with her for as long as they needed.

{¶ 50} With respect to G.A., however, the GAL explained that she had been in four different foster homes since September 2015. The GAL testified that if G.A. had to be placed in a different foster home again due to her behavior, it would not be good for her. She agreed that G.A. needed permanency, but opined that even G.A.'s current placement was not as stable as the boys' placement. But the GAL testified that G.A. has a bond with her foster mother, who she refers to as "grandma." The GAL explained that "sometimes," G.A. wants to remain with her foster mother and "then she wants to go with mom." The GAL testified, however, that "when [G.A.] wants to go with mom she becomes so depressed that she cries." The GAL reported that the foster mother told the GAL that G.A. "cries herself to sleep" at night. Based upon these reasons, the GAL recommended that mother get legal custody of G.A. with protective supervision. The GAL noted, however, that she had concerns about mother's housing due to the fact that mother was supposed to move and she did not know where. The GAL further stated that she did not believe mother could handle all four children and their behaviors, but "maybe just one child she could."

### C. Juvenile Court's Judgment

{¶ 51} The juvenile court found by clear and convincing evidence that under R.C. 2151.414(B)(1)(a), G.A. could not be placed with either parent within a reasonable time or should not be placed with either parent (G.A.'s father had been in federal prison in New York through the pendency of the case) and that it was in G.A.'s best interest to be placed in the permanent custody of the agency.

**{¶ 52}** With respect to the best interest factors, the juvenile court found that CCDCFS presented clear and convincing evidence that (1) G.A. had been in the custody of the agency since September 2015, and in the temporary custody since March 5, 2016, (2) G.A. had been in approximately four different placements, (3) G.A. had expressed her wishes to various people and she "goes back and forth with whether she wants to return home to [m]other," (4) the court conducted an in-camera interview with G.A., who expressed her wishes to the court, and (5) factors under R.C. 2151.414(E)(7) and (10) apply to mother.

**{¶ 53}** With respect to the factors under R.C. 2151.414(E) (which the court must consider before making the finding under R.C. 2151.414(B)(1)(a), i.e., whether the children could be placed with a parent within a reasonable time or should not be placed with a parent), the court found that the following factors apply to mother:

> R.C. 2151.414(E)(4), mother has demonstrated lack of commitment toward G.A.;

> R.C. 2151.414(E)(6), mother was convicted of endangering children under R.C. 2929.22 and domestic violence under R.C. 2929.25 and the child or a sibling of the child was a victim of the offense;

> R.C. 2151.414(E)(10), mother abandoned G.A. for 2½ years while she was incarcerated; and

> R.C. 2151.414(E)(16), other relevant factors: (1) mother lost custody of an older child in 2004 to 2005 due to noncompliance with her case plan, (2) mother's housing is "up in the air," and (3) mother is currently on parole, was not allowed to have unsupervised visits with G.A., and the court was not sure when mother would be released from parole.

## II. Permanent Custody Determination

{¶ 54} Parents have a basic and fundamental interest in the care, custody, and management of their children. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). The Ohio Supreme Court recognizes this right as well. *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990); *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28. Parental rights, however, are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child. *In re K.M.*, 10th Dist. Franklin Nos. 15AP-64 and 15AP-66, 2015-Ohio-4682, ¶ 15, citing *In re Cunningham*, 59 Ohio St.2d 100, 391 N.E.2d 1034 (1979).

{¶ 55} The termination of parental rights is governed by R.C. 2151.414. *In re M.H.*, 8th Dist. Cuyahoga No. 80620, 2002-Ohio-2968, ¶ 22. R.C. 2151.414 sets forth a two-part test courts must apply when deciding whether to award permanent custody to a public services agency. Under the first prong, a court must find by clear and convincing evidence one of the following five factors:

> (a) * * * [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents [in making this determination, the juvenile court must consider the factors set forth in R.C. 2151.414(E), which are set forth in the analysis below];
>
> (b) The child is abandoned;
>
> (c) The child is orphaned and no relatives are able to take permanent custody of the child;
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * * ; or

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a)-(e).

{¶ 56} The second prong requires the court to find, also by clear and convincing evidence, that granting permanent custody of the child to the agency is in the best interest of the child. R.C. 2151.414(D)(1) sets forth best-interest factors that the court must consider when making the best-interest determination under R.C. 2151.414(D)(1), including:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child * * *;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) apply in relation to the parents and child.

{¶ 57} An appellate court will not reverse a juvenile court's decision awarding permanent custody to an agency if the judgment is supported by clear and convincing evidence. *In re J.M-R.*, 8th Dist. Cuyahoga No. 98902, 2013-Ohio-1560, ¶ 28. "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the

allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). A reviewing court is required to examine the record to determine whether the trier of fact had sufficient evidence to satisfy the clear and convincing standard. *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, ¶ 24.

**A. The First Prong**

{¶ 58} Mother concedes that the agency established the first prong by clear and convincing evidence because G.A. had been in the agency's custody for 12 or more months of a consecutive 22-month period under R.C. 2151.414(B)(1)(d). Mother is not correct, however, that the juvenile court made the "12 of 22" finding. In fact, the juvenile court could not have made that finding because the agency filed the permanent custody motion before the children had been in its custody for 12 months. *See In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 25-26. Instead, the juvenile court here found that R.C. 2151.414(B)(1)(a) applied, that is, that G.A. could not be placed with mother within a reasonable time or should not be placed with mother. Mother does not challenge this finding.

**B. The Second Prong — Best Interest**

{¶ 59} In her sole assignment of error, mother contends that the juvenile court erred when it found the agency met its burden on the second prong of the permanent-custody determination, that is, that granting permanent custody of G.A. was in her best interest under R.C. 2151.414(D)(1). We do not need to determine if the trial court correctly applied the R.C. 2151.414(D)(1) factors, however, because the trial court also found that it was in G.A.'s best interest to be placed in the

permanent custody of the agency under R.C. 2151.414(D)(2).  And a finding under section (D)(2) of R.C. 2151.414 mandates that the trial court find it is in a child's best interest to be placed in the agency's permanent custody.

**1. R.C. 2151.414(D)(2)**

{¶ 60} R.C. 2151.414(D)(2) states:

If *all of the following apply*, permanent custody is in the best interest of the child, and the court *shall commit the child to the permanent custody* of a public children services agency or private child placing agency:

(a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.

(c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

(Emphasis added.)

{¶ 61} R.C. 2151.414(D)(2) was added to the statute as part of 2007 Am.Sub.H.B. No. 7, which became effective in April 2009.  R.C. 2151.414(D)(1) and 2151.414(D)(2) are alternative means for reaching the best-interest determination. *In re M.K.*, 10th Dist. Franklin No. 09AP-1141, 2010-Ohio-2194, ¶ 22.  Under R.C. 2151.414(D)(2), if the juvenile court makes the four enumerated findings,

permanent custody is per se in the child's best interest and the court "shall" commit the child to the permanent custody of the agency. *In re J.R.*, 10th Dist. Franklin No. 17AP-698, 2018-Ohio-1474, ¶ 41; *see also In re R.M.*, 8th Dist. Cuyahoga Nos. 99809, 99810, and 99811, 2013-Ohio-4928, ¶ 15 ("R.C. 2151.414(D)(2) also requires that a court grant permanent custody to the state if four factors are met[.]"); *In re M.P.*, 10th Dist. Franklin No. 10AP-478, 2010-Ohio-5877, ¶ 35 ("R.C. 2151.414(D)(2) sets forth the circumstances under which a juvenile court is required to grant permanent custody, while the court employing the factors in R.C. 2151.414(D)(1) considers them to determine whether the best interests of the children are served in granting the permanent custody motion."); *In re K.T.1*, 2018-Ohio-4312, 121 N.E.3d 847, ¶ 74 (1st Dist.) ("If all of the requirements of R.C. 2151.414(D)(2) are satisfied, then the juvenile court must grant the permanent-custody motion.").

{¶ 62} To ascertain whether R.C. 2151.414(D)(2)(a) applies, we must look to R.C. 2151.414(E) because determining "that a child cannot be placed with the parents within a reasonable time or should not be placed with them, the court must find, by clear and convincing evidence, that *at least one of the factors* in R.C. 2151.414(E)(1)-(16) is present." (Emphasis sic.) *In re S.C.*, 8th Dist. Cuyahoga No. 108036, 2019-Ohio-3664, citing *In re S.W.*, 11th Dist. Ashtabula No. 2017-A-0089, 2018-Ohio-1672. Here, the juvenile court made three findings with respect to mother under R.C. 2151.414(E) (four including "other relevant factors" under R.C. 2151.414(E)(16)). We must therefore determine if at least one of these findings is supported by clear and convincing evidence.

{¶ 63} Factor (6) under R.C. 2151.414(E) states in relevant part that "[t]he parent has been convicted of or pleaded guilty to an offense under division (A) or (C) of section 2919.22 or under section * * * 2919.25 * * * of the Revised Code, and the child or a sibling of the child was a victim of the offense[.]" Mother argues that because she was convicted of child endangering under R.C. 2919.22(B)(3), her conviction does not fall under this provision. While mother is correct about her child-endangering conviction, her domestic violence conviction under R.C. 2919.25 does fall within R.C. 2151.414(E)(6). Therefore, the court was required to enter a finding that G.A. could not be placed with mother within a reasonable time or should not be placed with mother. Thus, we find R.C. 2151.414(D)(2)(a) applies.

{¶ 64} Further, R.C. 2151.414(D)(2)(b), (c), and (d) also apply. G.A. had been in the agency's custody well beyond two years and no longer qualified for temporary custody. G.A. did not meet the requirements for a planned permanent living arrangement (to do so, a child must be at least 16 years years old). And there were no relatives who could take legal custody of her. Therefore, no matter the juvenile court's best-interest findings under R.C. 2151.414(D)(1), section (D)(2) mandates that permanent custody was in G.A.'s best interest and that the court "shall commit the child to the permanent custody of a public children services agency or private child placing agency[.]"

### 2. R.C. 2151.414(D)(1)

{¶ 65} Nonetheless, we will briefly address mother's arguments with respect to the juvenile court's R.C. 2151.414(D)(1) best-interest findings. The juvenile court

found that CCDCFS presented clear and convincing evidence that (1) G.A. had been in the custody of the agency since September 2015 and in the temporary custody since March 5, 2016, (2) G.A. had been in approximately four different placements, (3) G.A. had expressed her wishes to various people and she "goes back and forth with whether she wants to return home" to mother, (4) the court conducted an in-camera interview with G.A., who expressed her wishes to the court, and (5) R.C. 2151.414(E)(7) and (10) apply to mother.

{¶ 66} After review, we find that there is clear and convincing evidence in the record to support the juvenile court's first four findings under R.C. 2151.414(D)(1). We do, however, agree with mother that R.C. 2151.414(E)(7) and (E)(10) do not apply.

{¶ 67} R.C. 2151.414(E)(7) lists a number of convictions that a court can consider when determining whether permanent custody is in a child's best interest if a parent is convicted of one of them. Child endangering under R.C. 2919.22(B)(2) is included, but not R.C. 2919.22(B)(3), which was mother's conviction. Domestic violence is also not listed under R.C. 2151.414(E)(7). Thus, R.C. 2151.414(E)(7) is not applicable in this case under R.C. 2151.414(D)(1).

{¶ 68} With respect to R.C. 2151.414(E)(10), it provides that "[t]he parent has abandoned the child." The court found that mother abandoned G.A. for 2½ years when mother was in prison (mother was actually incarcerated for a little less than two years). Under R.C. 2151.011(C), abandonment is presumed after 90 days of no contact. It states, "For the purposes of this chapter, a child shall be presumed

abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." In this case, the evidence established that mother had to abide by a no-contact order that was in place due to her criminal convictions. Thus, abandonment does not apply in this case. *But see In re J.B.*, 5th Dist. Stark Nos. 2017CA00180 and 2017CA00181, 2018-Ohio-397, ¶ 38-39 ("We find [m]other's voluntary actions created the circumstances which led to the issuance of the Order. * * * Accordingly, under these circumstances, we find no error in the trial court's finding the children were abandoned as contemplated by R.C. 2151.011(C)").

{¶ 69} Nonetheless, we find that the record clearly and convincingly supports the juvenile court's remaining best-interest factors under R.C. 2151.414(D)(1). It is important to remember that when considering the best-interest factors under R.C. 2151.414(D)(1), "[t]here is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. This court has stated that only one of these enumerated factors needs to be resolved in favor of the award of permanent custody. *In re Moore*, 8th Dist. Cuyahoga No. 76942, 2000 Ohio App. LEXIS 3958 (Aug. 31, 2000), citing *In re Shaeffer*, 85 Ohio App.3d 683, 621 N.E.2d 426 (3d Dist.1993).

{¶ 70} After a review of the record, we conclude that there is clear and convincing evidence in the record to support the juvenile court's finding that it was

in G.A.'s best interest to be placed in the permanent custody of the agency under R.C. 2151.414(D)(1).

{¶ 71} Although G.A. vacillated between wanting to remain in her foster home and returning to her mother's care, she was only 11 years old. She was in need of permanency. G.A. had been in four different foster homes, but the social worker testified that she believed G.A. could remain in her current foster home for as long as she needed. The evidence further established that mother had not been involved in family counseling for over 10 months. Mother was attempting to get re-involved, but the fact remains that she decided to quit going to family counseling just because the counselor told the juvenile court something she did not like. G.A. was struggling with many issues. Mother needed to attend family counseling to learn how to handle the issues that G.A. was experiencing.

{¶ 72} The evidence further established that mother was moving out of her apartment at the time of the hearing. She had a voucher that would help her with rent, but without a home for the agency to determine was appropriate, there was no housing. Mother also did not have a verified source of income to provide for G.A.'s basic needs.

### C. Manifest Weight

{¶ 73} Mother also argues that even if this court finds that the there was clear and convincing evidence to support the "juvenile court's best-interest finding," we should still reverse the parental rights termination as against the manifest weight of the evidence.

{¶ 74} In a permanent custody case, "the ultimate question for a reviewing court is whether the juvenile court's findings are supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43. This is because a juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence "if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence." *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16.

{¶ 75} There is one problem with mother's argument. Under R.C. 2151.414(D)(2), the juvenile court did not have an option in this case. If all four of the factors under R.C. 2151.414(D)(2) are present, the juvenile court must find that it is in a child's best interest to be placed in the permanent custody of the agency. As we set forth earlier in the opinion, the four factors under R.C. 2151.414(D)(2) were present by clear and convincing evidence: (1) G.A. could not be placed with mother within a reasonable time or should not be placed with mother, (2) G.A. had been in the agency's custody for almost four years, (3) G.A. does not meet the requirements of a planned permanent living arrangement, and (4) there were no relatives or other person who could take legal custody of G.A.

{¶ 76} Accordingly, we overrule mother's sole assignment of error.

{¶ 77} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, PRESIDING JUDGE

FRANK D. CELEBREZZE, JR., J., and
LARRY A. JONES, SR., J., CONCUR