[Cite as *In re C.A.*, 2024-Ohio-4600.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: C.A., I.C., P.C., AND L.A. | : | APPEAL NO. C-240335 |
| | | TRIAL NO. F18-1402X |
| | : | |
| | : | *O P I N I O N.* |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: September 20, 2024

*Jeffrey J. Cutcher*, for Appellant Mother,

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Thomas Koopman*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Robert Adam Hardin*, for the Children's Guardian Ad Litem.

**WINKLER, Judge.**

{¶1}    Appellant mother appeals the decision of the Hamilton County Juvenile Court granting permanent custody of three of her children to the Hamilton County Department of Job and Family Services ("HCJFS").  We find no merit in her two assignments of error, and we affirm the juvenile court's judgment.

## I.      *Factual Background*

{¶2}    On September 19, 2018, HCJFS obtained an ex parte award of emergency custody for  I.C., P.C., C.A., and L.A.  W.C. is the father of I.C. and P.C., and J.W. is the father of C.A. and L.A.  Neither father was meaningfully involved in the case, and they have not appealed the juvenile court's decision.  Mother had another child who reached the age of majority and aged out of the system.  I.C. was placed in a Planned Permanent Living Arrangement ("PPLA."), which mother does not contest. She has also reached the age of majority and is not the subject of this appeal.

{¶3}    On September 20, 2018, HCJFS received interim custody of P.C. and interim orders of protective supervision for I.C., C.A., and L.A.  Subsequently, the children were adjudicated dependent, due in part to P.C.'s special needs and mother's inability to protect the other children from P.C.  P.C. was placed in the temporary custody of HCJFS, and interim protective orders for the other children were terminated without any further court orders.  On June 8, 2020, HCJFS filed a motion to modify temporary custody of P.C. to permanent custody.

{¶4}    On February 6, 2020, HCJFA obtained an ex parte award of emergency custody of I.C., C.A. and L.A.  I.C. was adjudicated dependent and neglected, and C.A. and L.A. were adjudicated dependent.  Part of the reason for the adjudications was that mother was incarcerated for assault on a family member.  Mother had reported to a caseworker that she believed her sister was going to harm one of her children, so she

pulled a fork out of her bra and stabbed her. Additionally, I.C. repeatedly had soiled clothes and extreme body odor at school. Mother denied that the children had special needs. HCJFS was granted temporary custody of the children.

{¶5} On October 5, 2022, HCJFS filed a motion to modify temporary custody to permanent custody for I.C., C.A., and L.A. Subsequently, it withdrew that motion as to I.C., and filed a motion to modify temporary custody to a PPLA.

### A. Concerns about Mother

{¶6} Kayla Petrosky was the caseworker for the family from October 2020 until August 2022. She testified that when she first had responsibility for the case, the concerns were mother's mental health, her cognitive functioning, her out-of-control behaviors, and her ability to meet the children's extensive needs. As part of the case plan, mother was to sign releases of information, complete a diagnostic assessment, complete a psychiatric assessment, complete parenting education, complete random toxicology screens, participate in the children's treatment, resolve a criminal matter, refrain from receiving additional criminal charges, regularly visit the children, and maintain stable housing and income.

{¶7} Mother engaged in some mental-health services. But she was inconsistent with therapy. She went months without meeting with her therapists. According to Petrosky, mother had a pattern of not engaging in services for months, and then reengaging for a time before she stopped again. Conversations with mother were dominated by mother's assertions that she did not need therapy and did not have problems with anger or impulse control.

{¶8} Petrosky initially supervised some of mother's visits with the children. At one visit, mother brought a man to the visit. Petrosky asked him to leave, and mother got angry and yelled at her. Petrosky testified that many of her interactions

with mother involved her being combative and argumentative. Petrosky reported that she had observed several different men in mother's home. When she questioned mother about it, mother told her it was none of her business and had nothing to do with the children. Petrosky repeatedly had the same conversation with mother about unknown men in her home and why it mattered to HCJFS.

{¶9} Eventually mother began living with N.H., whom she later referred to as her fiancé. Petrosky attempted to engage with N.H. to discuss his background. He was incarcerated for a while after he began living with mother. When Petrosky broached the subject with mother, mother and N.H. told her that N.H.'s twin brother was the wrongdoer, and N.H. spent time in jail unjustly. N.H. never provided his fingerprints to HCJFS so it could complete a background check on him.

{¶10} Mother's housing was stable. She had lived in the same house since early in the case. Mother's rent was $900. Mother was unemployed and received $700 a month in social security disability. When Petrosky asked mother how she was able to pay bills, mother stated that friends help her.

{¶11} While the case was pending, mother was convicted of operating a vehicle while impaired ("OVI"). She opted to go to Talbert House in lieu of jail as a result of her conviction. Mother told Petrosky that Talbert House had nothing to do with alcohol issues. Mother also had a previous OVI conviction, and Petrosky had observed empty liquor bottles in the trash. Petrosky referred mother for random toxicology screens. Mother argued with her about the screens and said that she did not understand why needed to have them. Petrosky referred mother for five or more screens, and she did not attend any of them.

{¶12} Petrosky subsequently transferred the case to another caseworker. During the two years that Petrosky had the case, mother had completed a diagnostic

assessment, a psychiatric assessment, and parenting training. She attended therapy sporadically and was not engaged in her children's services.

{¶13} Bailee Brown became the family's caseworker in April 2023. HCFJS had continued concerns about mother's ability to meet the children's needs and the previous family violence. HCJFS referred mother for an updated diagnostic assessment and for two toxicology screens. Mother attended only one of the screens, and she tested positive for marijuana. At the time of the hearings on the motion for permanent custody, mother was not engaged in mental-health services.

### B. Visitation

{¶14} While Petrosky had previously supervised visits, they were later facilitated by the Family Nurturing Center ("FNC"). Mother's visits remained supervised at the facilitated level. She was inconsistent with her visits. There were periods of time when mother did not attend visits or wanted to convert to virtual visits because of the weather. Petrosky encouraged mother to attend visits in person.

{¶15} Lori Harman was the Senior Visitation Facilitator for FNC. She supervised mother's visits from March 2018 until January 2022. She reported that mother is bonded with the children. She described C.A. and L.A. as "very active." Mother often disrupted the visits by focusing on FNC's rules. Mother believed that the rules were not fair and she did not understand why someone followed her to the restroom or why she had to clean up the area. Mother often stated that the facility was not a prison, and she was not a slave.

{¶16} Mother would yell at the children's caregivers when visiting the children virtually. Due to mother's behaviors during virtual visits and her inconsistent visits, the virtual visits were discontinued. The children did not like the virtual visits and preferred to visit in person.

{¶17} At the in-person visits, mother told the children inappropriate things, such as they would be coming home soon. Hartman stated that she told mother that she was owed at least nine make-up visits. When she tried to schedule those visits, mother declined.

{¶18} Nevertheless, mother showed a love for her children and had positive interactions with them. She talked positively to the children and about the children. The children also had strong bonds with each other.

### C. The Children's Special Needs

{¶19} The children all have special needs. P.C., who was 16 at the time of the hearings, has the most severe issues. She was placed in T.C. Harris, a residential facility. Sommer Winkles, a qualified developmental disability professional and P.C.'s caseworker at TC Harris, testified. According to Winkles, P.C. was diagnosed with attention-deficit-hyper-activity disorder, autism, moderate intellectual disability, a seizure disorder, fatty-liver disease, a congenital heart abnormality, chronic ear infections, constipation, pica, allergies, and asthma. She is nonverbal.

{¶20} P.C. was placed in T.C. Harris in 2018, where she has a very structured routine. She is prescribed numerous medications and provided with therapy with a behavioral interventionalist, speech therapy, and occupational therapy multiple times per day. She resides in a locked secure unit with two staff members present at all times. She has a history of wandering and no safety awareness.

{¶21} P.C. often displays physical aggression. She hits staff members and other residents and harms herself. At the time of the hearing, she was highly motivated by food and had become aggressive around it. She is verbally disruptive in classes and on her unit. Winkles said that she has not made any progress in her physical aggression or verbal disruptions since she was placed there in 2018.

{¶22} Winkles further said that P.C. becomes dysregulated when she does not get her own way. She hits, scratches and bites others, as well as herself. Winkles testified that she has injured the staff daily and other residents once or twice a week. P.C. also hits herself in the face until she bleeds. Around the time of the hearings, that behavior was happening three to four times a week. T.C. Harris uses a technique involving the use of soft mats to block P.C.'s aggression.

{¶23} T.C. Harris has no plans to discharge P.C. Winkles stated that if she was not in a locked facility, she would need close supervision 24 hours a day. She said that the kitchen and the exits would need to be monitored, as well as her behavior around others.

{¶24} Winkles further testified that mother had visited P.C., and those visits generally went well. They seem to get along, and P.C. was excited when her mother brought snacks. Mother had also attended virtual visits and called to check on P.C.

{¶25} L.A. was six years old at the time of the hearings. He has resided with a foster family for three years. He also has been diagnosed with autism. Petrosky described him as "all over the place." He is hyperactive, had trouble focusing, and could be aggressive. He has severe behaviors, such as writing on walls, smearing feces, hurting pets, and wandering away. He is in transitional therapy, but has not made much progress. His foster parents are able to manage him, but they are diligent about watching him. He needs eyes on him at all times. An in-home service helps the foster parents manage his behavior. He has speech and occupational therapy, and his school setting is being evaluated to determine if he needs an alternative educational setting.

{¶26} L.A. is bonded with his foster parents. He goes to them for comfort and support. He has not expressed any concerns to his GAL about the foster home. His foster parents are interested in adopting him. Visits between him and his mother go well.

{¶27} C.A. was five years old at the time of the hearings. He has resided in a foster home for a year. His foster home has other children in the home and "lots of structure." He attends a therapeutic preschool and goes to therapy.

### D. Mother's Case-Plan Compliance

{¶28} Petrosky had ongoing concerns that mother did not understand or remember their conversations. She would continually repeat herself and have the same conversations with mother. Every meeting, mother wanted to go back and talk about the beginning of the case. Petrosky testified that mother was unable to make progress as a result of not being able to move forward from the past.

{¶29} Mother completed diagnostic and psychological assessments in the fall of 2021. The assessor stated that mother "was regarded to be only a moderately reliable historian," as her reported history was inconsistent with collateral sources. Mother presented as "somewhat oppositional, guarded, and untruthful in behavior." Mother was scheduled for personality testing, but declined the testing because "it served no purpose."

{¶30} Although mother did not complete all the testing, the assessors were able to generate a report. Mother was diagnosed with borderline intellectual functioning, and "other specified personality disorder," with paranoid, borderline, and antisocial features. The assessor reported that mother may require "repetition of information," and that she seemed to lack the "motivation and investment necessary to participate in psychotherapy in a meaningful way."

{¶31} Mother voiced concerns about the care her children were receiving. She believed T.C. Harris was experimenting on P.C. and that she was being sexually abused. Mother also believed that C.A. and L.A. were being sexually abused in their foster homes. HCJFS investigated mother's concerns and found them to be

unsubstantiated. Mother continually stated that she did not understand why the children needed supportive services. She believed that P.C.'s behavior was because she was placed at T.C. Harris. She also believed that L.A.'s behaviors were because he was in a foster home, and that C.A. was too young to need therapy.

{¶32} Mother stated that she could manage the children, but she was dismissive of their needs and unable to articulate an actual plan for their care. She voiced many times that she did not agree with some of the children's therapeutic services. Because she attended only a handful of the children's appointments, HCJFS did not think it likely that mother would be able to maintain all of the children's services.

### E. Mother's Testimony

{¶33} Mother testified on her own behalf. Much of her testimony directly contradicted the evidence presented by HCJFS. She testified that she had never missed a visit, and she had attended every scheduled toxicology screen. She denied that N.H., her fiancé, had any criminal history. She said that the case began only because her sister was trying to attack her daughter, and mother defended her. Mother said that she had "closed the door" on her sister. She also said that she missed appointments because HCJFS did not provide notice about the scheduled appointments.

{¶34} The magistrate awarded permanent custody of P.C., L.A., and C.A. to HCJFS. Mother filed objections in which she argued that the award was not supported by sufficient evidence, and that the magistrate's decision was against the manifest weight of the evidence. The juvenile court overruled the objections, and adopted the magistrate's decision as the court's judgment. This appeal followed.

### II.     Sufficiency

{¶35} In her first assignment of error, mother contends that the juvenile court's decision terminating her parental rights and awarding permanent custody of P.C., L.A., and C.A. to HCJFS was not supported by sufficient evidence.  This assignment of error is not well taken.

### A. Standard of Review

{¶36} A juvenile court's determination on a motion for permanent custody must be supported by clear and convincing evidence.  *In re R.B.*, 2019-Ohio-3469, ¶ 9 (1st Dist.); *In re W.W.*, 2011-Ohio-4912, ¶ 46 (1st Dist.).  Clear and convincing evidence has been defined as evidence sufficient to "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."  *In re K.H.*, 2008-Ohio-4825, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.  We must examine the record and determine if the juvenile court had sufficient evidence before it to satisfy the clear-and-convincing standard.  *In re R.B.* at ¶ 9; *In re W.W.* at ¶ 46.  We will not reverse a juvenile court's decision on appeal where the court "correctly applied the best-interests test and where its custody decision was amply supported by competent evidence in the record."  *In re R.B.* at ¶ 9, quoting *In re Allah*, 2005-Ohio-1182, ¶ 11 (1st Dist.).

### B. Statutory Requirements

{¶37} We first note that R.C. 2151.414, the applicable statute, was amended effective April 3, 2023. The  amendment made only minor changes.  Courts should apply the version of the statute in effect at the time the motion for permanent custody was filed.  *In re P., S., & M. Children*, 2024-Ohio-2794, ¶ 17 (1st Dist.); *In re M., R., & H. Children*, 2017-Ohio-1431, ¶ 15 (1st Dist.).  The motion to modify temporary custody of P.C. to permanent custody was filed on June 8, 2020, and the motion to modify

temporary custody of L.A. and C.A. to permanent custody was filed on October 10, 2022. The same version of the statute was in effect at the time of the filing of both motions, and we apply that version in determining this appeal.

{¶38} Former R.C. 2151.414(B) provided that the juvenile court could grant permanent custody of a child to a public children services agency if it found by clear and convincing evidence that (1) permanent custody was in the child's best interest and (2) one of the conditions in former R.C. 2151.414(B)(1)(a) through (e) applied. *In re Z.C.*, 2023-Ohio-4703, ¶ 7; *In re P., S., & M. Children* at ¶ 18. The juvenile court found that the children had been in HCJFS's custody for more than 12 months of a consecutive 22-month period. Therefore, the condition in former R.C. 2151.414(B)(1)(c) was met. Clear and convincing evidence supported that finding.

{¶39} Next, the trial court must determine whether a grant of permanent custody is in the children's best interest. *In re P. & H. Children*, 2019-Ohio-3637, ¶ 35 (1st Dist.). That finding can be mandatory or discretionary. Former R.C. 2151.414(D)(1) and 2151.414(D)(2) were "alternative means for reaching the best-interest determination." *In re P., S., & M. Children* at ¶ 19, quoting *In re J.P.*, 2019-Ohio-1619, ¶ 40 (10th Dist.).

### C. The Children's Best Interest

{¶40} Former R.C. 2151.414(D)(2) set forth a list of circumstances that, if all were found to exist, mandated a finding that granting permanent custody to a children services agency was in the best interest of the child. *In re P., S., & M. Children*, 2024-Ohio-2794, at ¶ 20 (1st Dist.), citing *In re R.D.*, 2022-Ohio-4519, ¶ 50 (8th Dist.). If all of the requirements of former R.C. 2151.414(D)(2) are satisfied, the juvenile court must grant the motion for permanent custody. *In re K.T.1*, 2018-Ohio-4312, ¶ 74 (1st Dist.). The juvenile court found that all four conditions were met.

**{¶41}** Three of the conditions are not in dispute. Under former R.C. 2151.414(D)(2)(b), the juvenile court determined that "the child [had] been in an agency's custody for two years or longer, and no longer qualifi[ed] for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code." This case has a long history, and the parties do not dispute that this condition was met.

**{¶42}** Under former R.C. 2151.414(D)(2)(c), the court determined that the child did not "meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code." Mother concedes that L.A. and C.A. did not meet those requirements.

**{¶43}** Finally, under former R.C. 2151.414(D)(2)(d), the court determined that "[p]rior to the dispositional hearing, no relative or other interested person [had] filed, or [had] been identified in, a motion for legal custody of the child." The parties do not dispute that no relative or other interested party was identified.

**{¶44}** Mother argues that the condition in former R.C. 2151.414(D)(2(a) was not met. It provided that the court had to "determine by clear and convincing evidence that one or more of the factors in division (E) of this section exist[ed] and the child [could not] be placed with one of the child's parents within a reasonable time or should not be placed with either parent."

**{¶45}** Former R.C. 2151.414(E) provided that in determining whether a child could not be placed with either parent within a reasonable time or should not be placed with the parents, the court should consider all relevant evidence. If the court determined that one or more of the factors listed existed as to each of the child's parents, the court should enter a finding that the child could not be placed with either parent within a reasonable time or should not be placed with either parent.

**{¶46}** The juvenile court determined that the factor listed in former R.C. 2151.414(E)(1) applied. It provided, "Following the placement of the child outside the

12

child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home." That determination was supported by clear and convincing evidence.

{¶47} The court found that when mother was asked about the children's diagnoses, she could not recall all of them. She repeatedly informed Petrosky that she did not understand why the children needed services. She contended that P.C.'s problem behavior was due to her placement at T.C. Harris, L.A.'s behavior was due to him being in a foster home, and C.A. was too young for therapy. Mother attended some of the children's medical appointments, but not all, which raised concerns about her ability to provide consistent care.

{¶48} Mother argues that the court, in making those findings, relied on subsequent circumstances and issues, instead of focusing on the reasons the complaints were filed. The initial complaint was filed because of P.C.'s violent behavior. HCJFS was granted interim custody of P.C. and protective orders for the other children. Subsequently, HCJFS was granted temporary custody of P.C., and the protective orders were terminated.

{¶49} But HCJFS was granted temporary custody of I.C., L.A., and C.A. after mother stabbed her sister with a fork, refused to assist in obtaining medical care for L.A. and C.A., allowed I.C. to attend school with soiled clothes and extreme body odor, and denied the children's special needs. Subsequently, I.C. was adjudicated dependent and neglected, and L.A. and C.A. were adjudicated dependent. While HCJFS's initial involvement related to P.C., HCJFS had concerns about mother's mental health, cognitive functioning, out-of-control behaviors, and lack of ability meet all of her children's special needs.

{¶50} Next, the court determined that former R.C. 2151.414(E)(2) applied. The court found that mother had a "chronic mental illness" that made her "unable to provide an adequate permanent home for her children."

{¶51} Mother completed diagnostic and psychological assessments. She was also scheduled for additional testing, which she did not complete. Despite that lack of participation, a report was generated, which diagnosed mother with borderline intellectual functioning, and "other specified personality disorder" with paranoid, borderline, and anti-social features. The assessor also reported that mother required "repetition of information," which was also highlighted in Petrosky's testimony about repeated conversations with mother about the beginning of the case and her confusion as to why the children need supportive services. Mother contends that the evidence was not clear that her mental health and intellectual disability were so severe that she could not care for the children. We disagree. Clear and convincing evidence supported the juvenile court's findings.

{¶52} Finally, as to mother, the court determined that former R.C. 2151.414(E)(4) applied. It stated, "The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child." Clear and convincing evidence supported that determination.

{¶53} The court found that mother periodically had been inconsistent in regularly visiting with the children when she was able to do so. The court acknowledged that throughout the case, mother had visited the children and that she continued to be "well-bonded" with them. But the record also showed that there were "periods of inconsistency." Mother requested virtual visits because the temperature outside was too hot or too cold. Even with virtual visits, mother did not consistently

attend, claiming that she had trouble logging on or her phone battery was dead. Because of her failure to attend, the visits were "transition[ed] back to in-person."

{¶54} Mother argues that the court ignored the fact that mother was approved for in-home visits by the end of 2021, which never occurred. But that approval did not change the fact that she failed to consistently visit her children. When visiting the children at FNC, she missed both in-person and virtual visits. She missed some visits without notice or showed up so late that the visits had already been cancelled. Further, mother was owed make-up visits that she declined to schedule.

{¶55} As to P.C., when she was first placed at T.C. Harris, the facility was under Covid restrictions and mother could not visit in person. But mother could have phone calls with P.C., however she did not call on a consistent basis. Once in-person visits resumed, HCJFS arranged transportation for mother to get to T.C. Harris, but those visits were inconsistent because mother was unhappy with the amount of time it took to get there and spending time in the car with the transportation providers.

{¶56} Finally, the court determined under former R.C. 2151.414(E)(10) that both of the children's fathers had abandoned them. Mother does not dispute this finding.

{¶57} Thus, clear and convincing evidence supported the juvenile court's findings that one or more factors set forth in former R.C. 2151.414(E) exist, and that the children cannot be placed with one of their parents or should not be placed with either parent. The trial court did not err in determining that the condition set forth in former R.C. 2151.414(D)(2)(a) was met.

{¶58} Because all four conditions were met, a grant of permanent custody to HCJFS was mandatory. *See In re C.M.*, 2015-Ohio-3971, ¶ 32 (1st Dist.). The trial court's award of custody was supported by clear and convincing evidence, and

therefore, the evidence was sufficient to support the court's judgment. Consequently, we overrule mother's first assignment of error.

### III.     Manifest Weight of the Evidence

{¶59} In her second assignment of error, mother contends that the juvenile court's decision granting permanent custody of L.A. and C.A. to HCJFS is against the manifest weight of the evidence. A review of the sufficiency of the evidence is different from a review of the weight of the evidence. *In re P. & H. Children*, 2019-Ohio-3637, at ¶ 7 (1st Dist.). When conducting a weight-of-the-evidence review in permanent-custody cases, the appellate court "must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence," the juvenile court lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. *Id*., quoting *In re A.B.*, 2015-Ohio-3247 ¶ 16 (1st Dist.).

{¶60} After reviewing the record, we cannot hold that trial court lost its way and created such a manifest miscarriage of justice that we must reverse the judgment and order a new trial. Therefore, the judgment was not against the manifest weight of the evidence. *See In re P, M, & S Children*, 2024-Ohio-2794, at ¶ 28 (1st Dist.); *In re P. & H. Children* at ¶ 7. We overrule mother's second assignment of error and affirm the trial court's judgment.

Judgment affirmed.

**BOCK, P.J.,** and **CROUSE, J.,** concur.

Please note:
    The court has recorded its own entry this date.